**FILED**

APR 2 2 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CHIRON CORPORATION,

        Plaintiff,

    v.

GENENTECH, INC.,

        Defendant.

NO. CIV. S-00-1252 WBS GGH

MEMORANDUM AND ORDER

----oo0oo----

     In this lawsuit, Chiron alleges that Genentech's product, Herceptin, infringes Chiron's United States Patent No. 6,054, 561 ("'561 patent"). The court is now called upon to construe the terms of '561 patent. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 968 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996).

I.  Factual and Procedural Background

     The '561 patent issued on April 25, 2000 from a long line of patents and patent applications dating back to February 8, 1984 and January 11, 1985. Generally, the patent claims monoclonal antibodies capable of binding to specific human breast cancer antigens.

1

407

1          Antibodies, also known as "immunoglobulins," are
2  produced by the immune system in response to the presence of an
3  antigen, or foreign substance, in the body.  Antibodies recognize
4  and bind to specific receptor sites, or "epitopes," on the
5  antigen.  Because antibodies are capable of homing in on specific
6  antigens, they are useful for identifying and destroying harmful
7  agents in the body, such as bacteria, viruses, and cancer cells.
8  For example, a toxin may be attached to an antibody so that it
9  will kill the antigen to which it binds.

10         Structurally, an antibody is a "Y" shaped molecule
11  composed of four "chains" of amino acids: two identical heavy
12  chains, and two identical light chains.  The two arms of the "Y"
13  are collectively referred to as the "variable region," while the
14  tail end is called the "constant region."  It is the variable
15  region of the antibody that does the important work of
16  recognizing and binding to the antigen.  More specifically,
17  "complimentarity determining regions" ("CDRs") and "framework
18  regions" ("FRs") within the variable region form a three-
19  dimensional structure that fits in lock-and-key fashion to a
20  particular receptor site on the antigen.  The portion of the
21  antibody that binds to the antigen is sometimes referred to as
22  "the antigen binding site."

23         When responding to the presence of an antigen, the body
24  may produce many different antibodies that bind to different
25  receptor sites on the antigen.  Antibodies that have identical
26  antigen binding sites, however, will attach to the same receptor
27  site on the same antigen.

28         Homogenous preparations of identical antibodies, all of

                                2

1 which have a high affinity for binding to cancerous antigens and
2 can distinguish cancer antigens from normal tissue, are useful in
3 the treatment and diagnosis of cancer.  In the 1980s, scientists
4 at Cetus (Chiron's predecessor) attempted to create antibodies
5 having these characteristics.  To do so, they utilized the
6 "hybridoma method,"[1] which is described at length in the '561
7 patent, as well as in the 1984 and 1985 priority applications.
8 Briefly put, it involves taking a human cancer cell and injecting
9 it into a mouse, which produces antibodies in response.  The
10 murine (mouse) B-cells that produce the antibodies are then
11 isolated.  Because each B-cell is unique and produces only one
12 kind of antibody, a B-cell with an extended life span can produce
13 numerous, identical antibodies.  Accordingly, once the B-cell is
14 isolated, it is fused with an immortal myeloma tumor cell.  The
15 resulting hybrid cell, or "hybridoma," is an immortal cell line
16 that is capable of producing an unlimited supply of identical
17 antibodies.  The parties agree that antibodies produced by these
18 methods are "monoclonal antibodies" (i.e. coming from "one
19 cloned" cell).

20      Cetus scientists tested hundreds of these monoclonal
21 antibodies until they isolated ones capable of recognizing human
22 breast cancer antigens, and binding strongly to them but not to
23 normal cells and tissues.  Specifically, they found that
24 antibodies 454 C11 and 520 C9 bound to an antigen that occurred
25 with great frequency in breast cancers, but with little frequency

26

27      [1]    This method was developed by Drs. Georges Kohler and
   Cesar Milstein in 1975, and is sometimes referred to as the
28 "Kohler-Milstein method".

1  in normal tissue.

2  Scientists soon discovered that the murine monoclonal
3  antibodies produced by the hybridoma method described above were
4  problematic for diagnosis and treatment.  The murine origin of
5  the antibodies provoked a HAMA ("Human Anti-Mouse Antibody")
6  response in patients, as the human body rejected the murine
7  antibodies as foreign matter.  Scientists therefore began
8  investigating other methods for producing antibodies that would
9  retain the antigen binding sites of the murine monoclonal
10  antibodies, but would not produce an immunogenic response.

11  One such development was a "chimeric antibody," created
12  by attaching mouse-derived variable regions to human constant
13  regions.[2]  Subsequently, scientists developed a more
14  sophisticated "humanized antibody," in which only the antigen
15  binding sites were murine in origin.  Scientists were able to
16  identify the amino acid sequences in the murine antibody that
17  code for the cancer-specific antigen binding sites.  They then
18  used recombinant DNA technology to combine these murine amino
19  acid sequences with human amino acid sequences.  Thus, the
20  resulting humanized antibody retained the beneficial binding
21  properties of the murine antibody while minimizing the potential
22  for an adverse immune response.  The accused product, Herceptin,
23  is precisely this kind of humanized antibody.

24  The central dispute in this case is whether the term
25  "monoclonal antibody" as used in the '561 patent encompasses
26  humanized antibodies.  The parties also dispute the meaning of

27

28  [2]  The literature also refers to "hybrid," "altered" and "recombinant" antibodies.

4

1  the claim terms "binds," "antigen," "strong staining,"
2  "immunoassay," "extracellular domain," and "human c-erbB-2
3  antigen."

4         A <u>Markman</u> hearing was held on March 5-7, 2002 before
5  Magistrate Judge Hollows.  On March 25, 2002, Magistrate Judge
6  Hollows filed findings and recommendations regarding the
7  construction of the above terms.  (<u>See</u> Mar. 25, 2002, Findings
8  and Recommendations)(hereinafter "F & R's").  Both Chiron and
9  Genentech filed objections to the findings and recommendations,
10 which the court now reviews de novo.  <u>See</u> 28 U.S.C. § 636
11 (b)(1)(C); Local Rule 72-304.

12 II.  <u>Discussion</u>

13         Claim construction is a matter of law for the court to
14 decide.  <u>Phonometrics v. Nothern Telecom Inc.</u>, 133 F.3d 1459,
15 1463 (Fed. Cir. 1998).  The purpose of claim construction is to
16 "elaborat[e] the normally terse claim language in order to
17 understand and explain, but not to change, the scope of the
18 claims."  <u>Gart v. Logitech</u>, 254 F.3d 1334 (Fed. Cir.
19 2001)(quoting <u>Embrex, Inc. v. Sev. Eng'g Corp.</u>, 216 F.3d 1343,
20 1347 (Fed. Cir. 2000))(internal quotations and citation omitted).
21 In construing claim terms, "the focus is on the objective test of
22 what one of ordinary skill in the art at the time of the
23 invention would have understood the term to mean."  <u>Markman</u>, 52
24 F.3d at 968; <u>Kopykake Enterprises, Inc. v. Lucks Co.</u>, 264 F.3d
25 1377, 1383 (Fed. Cir. 2001)(construing the patent "as of the date
26 the invention was constructively reduced to practice – the date
27 the patent application was filed").

28         In this case, the '561 patent claims priority based on

5

the 1984 and 1985 applications.  For the invention claimed in the '561 patent to get the benefit of the 1984/1985 filing dates, it must have been reduced to practice in 1984/1985.  See Transco Products, Inc. v. Performance Contracting, Inc., 38 F.3d 551 (Fed. Cir. 1994)(holding that an invention is entitled to the filing date of parent applications if it is supported by the disclosure in the parent applications).  Accordingly, the court construes the disputed terms as they would have been understood by one skilled in the art in 1984 and 1985.

The objective meaning of the claims can ordinarily be ascertained from three pieces of "intrinsic evidence": the claim language, the patent specification, and the prosecution history. Level One Communications, Inc. v. Seeq Technology, Inc., 987 F. Supp. 1191 (N.D. Cal. 1997)(citing Vitronics Corp. v. Conceptronic, Inc., 90 F .3d 1576, 1582 (Fed. Cir. 1996)). "[T]he actual words of the claim are the controlling focus," and the starting point for claim construction. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998)(discussing the "hierarchy of analytical tools").  The specification (also called the written description) aids in defining the terms used in the claims, particularly if the patentee has elected to define the terms himself.  See Vitronics, 90 F .3d at 1582, York Prods. Inc. v. Central Tractor Farm and Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).  Finally, the prosecution history is relevant "because it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean." Digital Biometrics, 149 F.3d at 1344.  The intrinsic evidence is "the most significant source of the legally operative meaning of

1  disputed claim language." <u>Vitronics</u>, 90 F.3d at 1582.

2          If the intrinsic evidence is insufficient for
3  determining the scope of the disputed claims, the court may then
4  rely on extrinsic evidence, such as dictionaries and expert
5  testimony, in "coming to the proper understanding of the claims."
6  <u>Id.</u> at 1583.   In addition, extrinsic evidence "may be accepted by
7  the court to enhance its understanding of the technology." <u>Gart</u>,
8  254 F.3d at 1340; <u>see</u> <u>also</u> <u>Pitney Bowes, Inc. v. Hewlett-Packard</u>
9  <u>Co.</u>, 182 F.3d 1298, 1308 (Fed. Cir. 1999)("It is entirely
10 appropriate, perhaps even preferable for a court to consult
11 trustworthy extrinsic evidence to ensure that the claim
12 construction . . . is not inconsistent with clearly expressed,
13 plainly, apposite and widely held understandings in the pertinent
14 technical field").   In referring to these additional sources, the
15 focus, of course, "remains on the meaning of claim language."
16 <u>Gart</u>, 254 F.3d at 1340.

17          A.   **"Monoclonal Antibody"**

18          The term "monoclonal antibody" appears in all of the
19 patent claims.   Claim 1 is representative:

20          A monoclonal antibody that binds to a human breast
            cancer antigen that is also bound by monoclonal
21          antibody 454 C11 which is produced by the hybridoma
            deposited with the American Type Culture Collection
22          having Accession No. HB 8484.[3]
            '561 Patent, Claim 1.
23 ///

24 ///

25 _____

26      [3]   The American Type Culture Collection ("ATCC") is a bank
   of tissues and cell lines.   Thus, persons skilled in the art can
   obtain hybridoma No. HB 8484 on file with the ATCC and make the
27 454 C11 monoclonal antibody referred to in the claim.   Using that
   antibody, the person can identify the breast cancer antigen
28 described in the claim.

7

1    Chiron and Genentech vigorously dispute the meaning of
2  the term "monoclonal antibody."  Genentech argues that
3  "monoclonal antibody" refers to a homogenous population of
4  antibodies having a structure that can be made by a murine
5  hybridoma.[4]  Chiron agrees that the term refers to a homogeneous
6  population of antibodies, but contends that the term is not
7  limited in any way by the type of antibodies making up the
8  population.

9         1.  Claim Language[5]

10    Looking at the claim language itself, only one
11  structural limitation can be inferred from the way "monoclonal

12

13         [4]    Genentech's proposed construction of this term has
changed over the course of this litigation.  Initially, Genentech
14  proposed that a monoclonal antibody referred to "a uniform
population of antibodies produced from a hybridoma." (Genentech
15  Claim Construction Statement, at 2:5-6.)  Magistrate Judge
Hollows rejected this construction because, among other things,
16  it improperly attempted to limit a product by the process in
which it was made.  (See F & R's at 24-27)("It is well
17  established that if the 'patent is upon a product, and if the
product complained of is the patented article substantially as
18  described, it makes no difference by what path or process, new or
old, inferior or improved, the infringing product is
19  manufactured.")(quoting Amgen Inc. v. Chugai Pharm. Co., 706 F.
Supp. 94, 103-104 (D. Mass. 1989)).  Genentech's new proposed
20  construction of "monoclonal antibody" defines the antibody in
terms of its structural characteristics, rather than as a product
21  of a particular process.  Genentech has also shifted its focus
away from the patent itself toward the prosecution history of the
22  patent.  Because Genentech has refocused its arguments, the
court's analysis will not track the analysis set forth in
23  Magistrate Judge Hollows' findings and recommendations.  However,
many of the substantive issues remain the same.
24

25         [5]    Genentech's objections to the findings and
recommendations do not discuss the term "monoclonal antibody" as
26  it is used in the '561 patent.  Rather, Genentech refers to the
prosecution history, and argues that it is dispositive of the
27  meaning of "monoclonal antibody."  Although the prosecution
history is relevant to claim construction, it is never the
28  starting point of the analysis.  The court looks first to the
patent itself.

8

1 antibody" is used: the antibody must have a structure that
2 enables it to bind to the referenced human breast cancer antigen.
3 The language of the claims, standing alone, does not support
4 Genentech's more limited construction.

        2.  Specification

6         The specification also supports a broad construction of
7 the term.  The specification expressly defines "monoclonal
8 antibody" as follows:

> As used herein, the term "monoclonal antibody" refers
> to an antibody composition having a homogeneous
> antibody population. The term is not limited regarding
> the species or source of the antibody, nor is it
> intended to be limited by the manner in which is is
> made. The term encompasses whole immunoglobulins.
> '561 Patent, 8:40-45 (emphasis added).

13         It is a well established rule of claim construction
14 that "an inventor may be his own lexicographer." Kopykake, 264
15 F.3d, at 1383.  Thus "[w]hen the meaning of a term is
16 sufficiently clear in the patent specification, that meaning
17 shall apply," even if common understandings of the term are
18 different.  Multiform Desiccants, Inc. v. Mezdam, Ltd., 133 F.3d
19 1473, 1477-78 (Fed. Cir. 1998).

20         In light of the above quoted definition, one skilled in
21 the field of microbiology and immunology in 1984 and 1985 would
22 interpret the term "monoclonal antibody" to encompass any
23 antibody, from any source or species (murine or otherwise),
24 produced by any method (known at the time or not), so long as the
25 population of antibodies is homogenous.  Therefore, the term
26 "monoclonal antibody" as defined in the specification is broad
27 enough to include homogenous populations of humanized antibodies.
28 Genentech's more limited construction is inconsistent with this

1  definition.

2       Genentech argues that other language in the
3  specification suggests that the term "monoclonal antibody" does
4  not include chimeric, hybrid, or humanized antibodies.  First,
5  Genentech points to the definition of "antibody":

6           The term "antibody" encompasses polyclonal [non-
             homogeneous] and monoclonal antibody preparations, as
7           well as preparations including hybrid antibodies,
             altered antibodies, chimeric antibodies and, humanized
8           antibodies.[6]
             '561 Patent, 8:36-39.
9

10 Genentech contends that the use of "as well as" indicates that
11 monoclonal antibody preparations are separate and distinct from
12 preparations including hybrid, chimeric, and humanized
13 antibodies.  As Genentech puts it, "saying that 'a balanced diet
14 consists of meats, fruits and vegetables, as well as bread and
15 dairy products' does not connote that bread and dairy products
16 are subsets of meats or fruits or vegetables."  (Genentech
17 Objections to F & R's, at 5.)

18       However, "as well as" does not always differentiate
19 between mutually exclusive categories.  See In re Hyatt, 708 F.2d
20 712, 714 (Fed. Cir. 1983)(stating that patent claims "must be
21 read in accordance with precepts of English grammar.")  For
22 example, one might say, "Our city is very diverse.  It has a

23

24       [6]   In discussing this language, Magistrate Judge Hollows
   referred to chimeric, hybrid, and humanized antibodies as
25 "distinct" subsets of antibodies. (See F & R's at 23:6-7.)
   Chiron objects to the characterization of these subsets of
26 antibodies as "distinct," and argues that they are overlapping.
   (Chiron Objections at 7.)  How these subsets are characterized,
27 however, is irrelevant to the construction of the term
   "monoclonal antibody."  Accordingly, the court will not decide
28 this issue at this time.

1 large African American and Asian population, as well as people
2 from many different religious backgrounds, such as Muslims,
3 Buddhists, and Jews." No one would interpret this phrase to mean
4 that African Americans cannot also be Muslims. Likewise, it is
5 not necessary to interpret monoclonal and humanized antibodies to
6 be mutually exclusive. An equally plausible interpretation of
7 the quoted language from the patent is that it describes two
8 separate attributes of antibodies: their composition (monoclonal
9 or polyclonal), and their structure (hybrid, chimeric, and
10 humanized). Under this interpretation, an antibody can be both
11 monoclonal and humanized.

12         The specification supports the latter interpretation.
13 For example, it discusses humanized antibodies, and refers to
14 non-hybridoma derived molecules as embodiments of the claimed
15 monoclonal antibodies. See '561 Patent, 11:12-12:26 (discussing
16 humanized antibodies); 5:40-46 ("In various related embodiments,
17 nucleic acid molecules are provided including . . . molecules
18 which combine murine CDRs with supporting human FRs . . . .");
19 see Bell Atlantic Network Serv. v. Covad Communcations Group,
20 Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001)("The written
21 description of the preferred embodiments . . . guides our
22 interpretation of the claim language, as claims must be read in
23 light of the specification.")[7]

24         Next, Genentech contends that language in the
25

26 [7]     Genentech argues that this interpretation renders the
categories of antibodies discussed in the patent "demonstrably
27 incomplete" because the mentioned structures do not include the
hybridoma-derived antibodies that are referenced throughout the
28 patent. (Genentech Objections to F & R's at 7.)  The definition
of "antibody," however does not purport to be all-inclusive.

1 "background" section of the specification "makes . . . clear"
2 that homogeneity is merely one of several attributes of a
3 monoclonal antibody.  Specifically, Genentech points to the
4 following sentence:

5   A monoclonal antibody belongs to a group of antibodies
6   whose population is substantially homogeneous, i.e. the
  individual molecules of the antibody population are
  identical except for naturally occurring mutations.
7   '561 Patent, 1: 50-54

8 This sentence certainly suggests that homogeneity is an attribute
9 of a monoclonal antibody, but it has nothing to say one way or
10 another about whether homogeneity is one of many relevant
11 attributes, or the only relevant attribute of a monoclonal
12 antibody.  The definition in the specification does; it makes
13 clear that a monoclonal antibody is an antibody that comes from a
14 homogeneous antibody population, without any other limitations.

15    Finally, Genentech argues that because the humanized
16 antibodies described in the patent are not referred to as
17 "monoclonal antibodies," the patentees must have intended to
18 carve out humanized antibodies from the classification of
19 monoclonal antibodies.  Given the express definition of the
20 patent, this interpretation is implausible.  The extrinsic
21 evidence helps to clarify this point.  At the Markman Hearing,
22 experts for both parties testified that humanized antibodies
23 would not be useful if they were not homogeneous. (Mar. 7 Markman
24 Tr. at 57:6-15)(testimony of Genentech expert Dr. Unkeless that
25 those in the field understand that a humanized antibody is
26 homogeneous "otherwise, why would you have it.")  Thus, one
27 skilled in the art would have understood humanized antibodies as
28 that term is used in the '561 patent to refer to homogeneous

1  populations of antibodies.  Because homogeneity would have been
2  assumed, using the term "monoclonal antibody" when referring to
3  humanized antibodies would have been unnecessary.

4       Therefore, looking at the claim language and the
5  specification, one skilled in the art in 1984 and 1985 would
6  broadly construe the term "monoclonal antibody" to mean any
7  homogeneous antibody population.  There is no support in the
8  issued patent for reading an additional structural limitation
9  into the claims.

10       3.  Prosecution History

11       The analysis does not end, however, with a review of
12  the claims and the specification.  The prosecution history, or
13  the back-and-forth between the patentee and the Patent and
14  Trademark Office ("PTO") prior to the issuance of the patent, can
15  shed light on the meaning of terms in the claims, and even limit
16  claim terms.  See Biovail Corp. Int'l v. Andrx Pharmaceuticals,
17  Inc., 239 F.3d 1297, 1301 (Fed. Cir. 2001)("Claim language . . .
18  must be read consistently with the totality of the patent's
19  applicable prosecution history.").  For example, "the prosecution
20  history limits the interpretation of claim terms so as to exclude
21  any interpretation that was disclaimed during the prosecution."
22  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576
23  (Fed. Cir. 1995).  The prosecution history may also "show a
24  particular meaning attached to the terms, or a position taken by
25  the applicant to ensure that the patent would issue."  Markman,
26  52 F.3d at 991.  "Although the prosecution history can and should
27  be used to understand the language used in the claims, it . . .
28  cannot 'enlarge, diminish, or vary the limitations in the

1  claims.'" Markman, 52 F.3d at 979 (quoting Goodyear Dental
2  Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880)).

3       The prosecution history of the '561 patent is long and
4  complicated.  In February of 1984, Chiron's predecessor, Cetus,
5  filed an application for a patent for monoclonal antibodies.  In
6  1985, and then again in 1995, Chiron filed continuation
7  applications.[8]

8       The 1985 application, though similar in many relevant
9  respects to the 1984 application, offered an explicit definition
10 of "monoclonal antibody" that did not appear in the 1984
11 application.  That definition is almost identical to the
12 definition found in the '561 patent.  The 1985 application
13 eventually became U.S. Patent No. 4,753,894 (the '894 patent),
14 which is the subject of related litigation between Chiron and
15 Genentech.  See Chiron v. Genentech, CIV-S-01-503 WBS/GGH.

16      The 1995 application was much longer than the 1984 and
17 1985 applications, and is the first application in the chain to
18 discuss recombinant and humanized antibodies.  The 1995
19 application initially contained claims to nucleic acid molecules

20

21      [8]     A "continuation" of an earlier parent application
   claims the same invention as the parent application, with some
22 variation in scope.  For example, a continuation might add new
   claims, or it might disclose newly discovered embodiments of the
23 existing claims.  To the extent that continuations add "new
   matter" that is not supported by the disclosures in the earlier
24 applications, they are not entitled to the filing dates of the
   earlier applications; otherwise, continuations date back to the
   parent application.  See Transco Products, Inc. v. Performance
25 Contracting, Inc., 38 F.3d 551 (Fed. Cir. 1994).  Thus, "[p]atent
   claims may . . . be amended to cover a competitor's product
26 discovered subsequent to the filing of the original application,
   so long as the amendments are supported by the disclosure in the
27 original application."  Laitram Corp. v. Morehouse Indus., Inc.,
   1197 U.S. Dist. LEXIS 23026, No. Civ. S-94-0452 WBS/GGH at *37-38
28 (E.D. Cal. Apr. 24, 1997).

14

1  encoding single chain polypeptides capable of binding to human
2  breast cancer antigens.  These claims were rejected by the PTO on
3  the basis that they were not supported by the priority
4  applications, and were obvious in light of intervening prior art.
5  Chiron then withdrew the rejected claims and added claims to
6  "monoclonal antibodies," which the PTO allowed.

7          After the claims were allowed, but before the patent
8  was issued, Chiron sought two "post allowance" amendments
9  pursuant to 37 C.F.R. § 1.312(a).  The first amendment revised
10 the definition of monoclonal antibody to "encompass[] only
11 subject matter that was encompassed by the term 'monoclonal
12 antibody' in the priority applications."  (Chiron Markman Exhibit
13 175, Tab 156).  The second amendment sought to add claims to (1)
14 monoclonal antibodies prepared by a hybridoma process; (2) a
15 hybridoma capable of producing monoclonal antibodies; (3)
16 monoclonal antibodies prepared by a cell line process; (4) a cell
17 line capable of producing monoclonal antibodies.  (Chiron Markman
18 Exhibit 175, Tab 157).  The patent examiner allowed only the
19 hybridoma claims, finding that the cell line claims did not find
20 support in the priority applications.  On April 25, 2000, the
21 '561 patent issued.

22              a.   The 1984 and 1985 Priority Applications

23          Genentech argues that given the prosecution history of
24 the patent, the meaning of the term "monoclonal antibody" as used
25 in the 1984 and 1985 priority applications controls the
26 construction of the term as it is used in the '561 patent.
27 Further, Genentech argues that the 1984 and 1985 applications use
28 the term "monoclonal antibody" in the limited sense of an

                              15

1  antibody having a structure derived from a murine hybridoma.

2          The court accepts Genentech's argument that the meaning
3  of "monoclonal antibody" in the '561 patent must be consistent
4  with the way the term was used in the priority applications.
5  During prosecution of the '561 patent, Chiron disclaimed an
6  interpretation of "monoclonal antibody" broader than the 1984 and
7  1985 applications.  To escape the examiner's prior art rejection
8  of the 1995 patent, Chiron withdrew the originally submitted
9  claims and added claims to monoclonal antibodies, stating that
10 "no new matter has been added by way of these amendments, and the
11 entry thereof is respectfully requested."  (Chiron Markman Ex.
12 175, Tab 146.)   Thus, Chiron represented to the PTO that the
13 monoclonal antibody claims were equivalent in scope to the parent
14 applications.  See York Products, Inc. v. Central Tractor Farm &
15 Family Center, 99 F. 3d 1568, 1575 (Fed. Cir. 1996)(holding that
16 an applicant can limit claims during prosecution by altering
17 claim language to escape an examiner rejection or by clearly
18 disavowing claim coverage).  In addition, in its first post-
19 allowance amendment,  Chiron amended its definition of
20 "monoclonal antibody" to "encompass[] only subject matter that
21 was encompassed by the term 'monoclonal antibody' in the priority
22 applications."  (Chiron Markman Exhibit 175, Tab 156).[9]

23

24         [9]    Genentech offers a number of other reasons why the
25 court should look to the priority applications.  For example,
   Genentech points out that the priority applications are
26 incorporated by reference into the '561 patent, and that Chiron
   submitted a terminal disclaimer during the prosecution of the
27 '561 patent.  Because Chiron's statements during the prosecution
   history regarding the meaning of "monoclonal antibody" are
28 sufficient to disclaim a meaning of the term broader than the
   1984 and 1985 applications, the court expresses no opinion

                                16

Accordingly, the court turns to the 1984 and 1985 applications.[10]

### i.   The 1984 Application

Like the '561 patent, the 1984 application concerns monoclonal antibodies capable of binding to human breast cancer antigens.  Although the application discusses primarily murine monoclonal antibodies, it is not necessarily so limited.  For example, while Claim 1 of the 1984 application claims "a murine monoclonal antibody that . . . binds selectively to human breast cancer cells," Claim 2 is not expressly limited to murine monoclonal antibodies. (See 1984 Application, at 28:1-18.) Rather, it is directed toward "a monoclonal antibody selected from the group consisting of [various antibodies including] 454 C 11 and monoclonal antibodies that are functionally equivalent to a member of said group."  (1984 Application, at 28:7-18.)

A more difficult question is how the term "monoclonal antibody" should be construed in light of the 1984 specification.

---

regarding the merits of these additional arguments.

[10]    Chiron argues that interpreting the '561 patent in light of the priority applications impermissibly blurs issues of validity and priority with the question of claim construction. See Vandor Corp. v. Wilson, 2001 WL 747281, No. IP 99-0946 C-M/S (S.D. Ind. Jul. 3, 2001)(holding that a partially formed validity argument cannot force a claim construction that is contrary to the plain meaning of the claim language read in light of the specification.  It is not clear to the court, however, that these issues can be separated.  Whether or not there was new matter added to the '561 patent, and regardless of the possibility that new matter in the '561 patent might have been invalidated by intervening prior art, Chiron represented to the PTO that the term "monoclonal antibody" was no broader than the scope of the 1984/1985 applications.  See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1356 (Fed. Cir. 1998) (a patentee can disclaim a particular interpretation even if the examiner was incorrect in making the rejection).  As a matter of claim construction (not validity or priority), the court is compelled to consider those applications.

The 1984 application lacks the expansive definition of "monoclonal antibody" found in the '561 patent; indeed, the term is not defined at all in the 1984 application.

In some respects, the 1984 specification supports a narrow construction of the term. For example, the specification repeatedly refers to the invention as a "murine monoclonal antibody," see 1984 Application, 1:5-9 ("This invention . . . concerns murine monoclonal anti-human breast cancer antibodies, [and] hybridomas that produce those antibodies . . . . ."); id. at 2: 7-17(describing the 454 C11 antibody and its functional equivalents as preferred embodiments of murine monoclonal antibodies that bind selectively to human breast cancer cells), and the only preferred embodiment disclosed in the specification is a murine, hybridoma-derived monoclonal antibody.

On the other hand, in describing the "important characteristics" of the invention, the 1984 specification does not refer to its murine hybridoma-derived structure:

> The important characteristics of the monoclonal antibodies are (1) their immunoglobulin class, (2) their selectivity for human breast cancer cells and the range of human breast cancer cells to which they bind and (3) their usefulness in making effective anti-human breast cancer immunotoxins.
> 1984 Application, at 5: 1-7.

In fact, it is evident from the application's discussion of prior art that murine monoclonal antibodies derived from hybridomas had already been discovered, and that the novel aspect of the invention concerned monoclonal antibodies capable of binding to specific breast cancer antigens. See 1984 Application at 1:11-2:5 (describing "background art" regarding murine monoclonal antibodies); id. at 10:24-11 (describing how, in order to make

18

1 the invention, the inventors prepared somatic cell hybrids using
2 existing hybridoma methods). Moreover, before setting forth the
3 best mode for making the invention, the 1984 specification
4 emphasizes that the monoclonal antibodies are not intended to be
5 limited by the manner in which they are made:

6         The following <u>examples</u> provide a detailed description
        of the preparation, characterization, and use of
7         <u>representative</u> monoclonal antibodies of this invention.
        <u>These examples are not intended to limit the invention</u>
8         <u>in any manner</u>.
        <u>Id.</u> at 10: 1-5 (emphasis added).
9

10         Nevertheless, Genentech argues that because only one
11 preferred embodiment is described in the specification, the
12 invention claim in the 1984 application is limited to that
13 embodiment.

14                         ii.   <u>1985 Application</u>

15         Genentech makes the same argument with respect to the
16 1985 application. Like the 1984 application, the only preferred
17 embodiment disclosed in the 1985 specification is a monoclonal
18 antibody derived from a hybridoma. However, the 1985 application
19 expressly defines "monoclonal antibody" for the first time:

20         As used herein, the term "monoclonal antibody" means an
        antibody composition having a homogeneous antibody
21         population. It is not intended to be limited as
        regards the source of the antibody or the manner in
22         which it is made.
        1985 Application, at 3:19-23.
23

24 This definition is virtually identical to the broad definition of
25 "monoclonal antibody" found in the '561 patent.[11]

26

27       [11]   The definition in the '561 patent adds that the
28 invention is not limited regarding the <u>species</u> from which the
antibody is derived. Genentech argues that the addition of the

19

1    The question for the court is whether, under these
2  circumstances, the monoclonal antibodies claimed in the priority
3  applications are limited to the preferred embodiment described
4  therein.

5                iii.   Preferred Embodiment As Limitation

6    The Patent Act, 35 U.S.C. § 112, requires the patent to
7  include a written description of the invention, including the
8  manner and method of its making and the best mode (or preferred
9  embodiment) for carrying it out, so that others skilled in the
10 art can use it.  See Brookhill-Wilk 1, L.L.C. v. Intuitive
11 Surgical, Inc., 178 F. Supp. 2d 356, 363 (S.D.N.Y. 2001)(citing
12 Wang, 197 F.3d at 1383).  A claim is ordinarily not limited to
13 the preferred embodiment described in the specification.
14 See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,
15 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996).  "However, in a given
16 case, the scope of the right to exclude may be limited by a
17 narrow disclosure."  Gentry Gallery, Inc. v. Berkline Corp., 134

18

19 word "species" means that "monoclonal antibody" has a broader
20 meaning in the '561 patent.  However, the PTO allowed the
   definition in the '561 patent with the reference to "species" on
21 the understanding that it had the same scope as the definition in
   the 1985 application.  In addition, both the issued patent and
   the 1985 application define "monoclonal antibody" as a
22 homogeneous population of antibodies, with no other structural
   limitations.  Given ordinary understandings of the phrase "not
23 limited by the manner in which it is made," it would not matter
   for either the 1985 application or the '561 patent whether
24 hybridoma or recombinant techniques were used.  The court, like
   Magistrate Judge Hollows, rejects Genentech's "strained
25 conjecture" that the "manner" in which the monoclonal antibody
   was created refers to in vivo or in vitro creation and the
26 "source" of the antibody refers to culture media or body fluids.
   (See F & R's at 22.) The only support for this argument comes
27 from a phrase that is in a completely different part of the
   application from the definition, and makes no reference to the
28 terms used in the definition.  See 1985 Application, 5:7-13.

                                20

1 F.3d 1473 (Fed. Cir. 1998).   For example, "[t]here are times when
2 an enumerated 'best mode' or 'preferred embodiment' of an
3 invention is, in fact, nothing more than the invention itself."
4 Brookhill-Wilk 1, L.L.C. v. Intuitive Surgical, Inc., 178 F.
5 Supp. 2d 356, 363 (S.D.N.Y. 2001)(citing Wang Labs. Inc. v.
6 America Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999)).

7        As the Federal Circuit has recognized, there is
8 sometimes a "fine line" between reading a claim in light of the
9 specification, which is permissible, and reading a limitation
10 into the claims from the specification, which is not.   See Comark
11 Communications v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir.
12 1998).   Although no hard and fast rules exist for drawing this
13 "fine line," some general principles can be gleaned from the case
14 law.   Courts have limited the claims to the preferred embodiments
15 disclosed in the specification in certain narrow circumstances
16 where (1) it is clear from the specification that the embodiment
17 is essential to the invention, or (2) the disclosure expressly
18 distinguishes other embodiments that the patentee later argues
19 are encompassed by the invention.[12]

20

21       [12]   Genentech appears to advocate a bright-line rule that
22 would limit an invention to the preferred embodiment if only one
   embodiment is disclosed in the specification.   Such a categorical
23 rule is contrary to the principle that "an applicant is not
   required to describe in the specification every conceivable and
24 possible future embodiment of his invention."   Rexnord, 274 F.3d
   at 1344.   The case law suggests that a more nuanced approach is
25 required.   See Gentry Gallery, 134 F.3d 1473 (patent for L shaped
   sofas with side-by-side recliner seats did not encompass sofas
26 with controls for the recliners located on arms of sofa, where
   the embodiment described the invention as having a console
27 between the seats, and the only discernable purpose for the
   console was to house the controls); Brookhill-Wilk, 178 F. Supp.
28 2d 356 (patent for surgery system that permits a surgeon to
   operate from "a remote location beyond a range of direct manual

21

1          For example, in <u>Watts v. XL Systems, Inc.</u>, 232 F.3d 877
2   (Fed. Cir. 2000), the Federal Circuit held that a patent for
3   joints and couplings in oil well pipes was limited to the
4   preferred embodiment disclosed in the specification, which was a
5   pipe joint having a varying tapered angle feature.   The
6   specification expressly stated that "the present invention
7   utilizes" a varying tapered angle feature, thereby equating the
8   invention with the preferred embodiment.   In addition, the
9   patentee had referred to the tapered angle feature in
10  distinguishing prior art.

11         Similarly, in <u>Wang Labs</u>, 197 F.3d at 1383-84, a patent
12  claiming a system providing computer users with "frames" of
13  textual and graphic information via a telephone network was
14  limited to the character-based "frames" disclosed in the patent.
15  The patent described only a character-based system, and language
16  describing the embodiment as a "preferred" embodiment that those
17  skilled in the art "may" make was insufficient to suggest that
18  other systems were contemplated.   In addition, the inventors had
19  distinguished over prior art by focusing on the character-based

20

21  control" did not encompass virtual surgery systems used within
    the operating room, given distinctions over prior art on the
22  basis that the invention allowed surgeons to operate from outside
    the hospital, as well as repeated emphasis in specification that
23  the patent would facilitate surgery around the world and reduce
    the cost of surgery by eliminating the need to travel to a
24  qualified surgeon); <u>Modine</u>, 75 F.3d 1545 (patent limited to
    particular embodiment because of an unambiguous amendment that
25  narrowed the range of the claim term); <u>Bell Atlantic</u>, 262 F.3d
    1258 (Fed. Cir. 2001)(rate of data transfer was not included in
26  the "plurality of different modes" claimed in the invention,
    because the specification repeatedly referred to "rate" and
27  "mode" as distinct concepts); <u>Laitram Corp. v. Morehouse
    Industries, Inc.</u>, 143 F.3d 1456(Fed. Cir. 1998)(limited because
28  patentee argued the embodiment distinguished over prior art).

1  aspect of the invention.

2           This case bears some similarity to <u>Watts</u> and <u>Wang Labs</u>
3  in that the invention is described in the priority applications
4  as if it were the preferred embodiment.  <u>See</u> 1984 Application
5  (<u>see</u> 1984 Application, 1:5-9 ("This invention . . . concerns
6  murine monoclonal anti-human breast cancer antibodies, [and]
7  hybridomas that produce those antibodies . . . . .").  However,
8  unlike the inventors in <u>Watts</u> and <u>Wang Labs</u>, the inventors here
9  did not focus on the murine-hybridoma structure to distinguish
10 prior art.  More importantly, unlike the patents at issue in
11 <u>Watts</u> and <u>Wang Labs</u>, the 1984 and 1985 applications expressly
12 contemplate other embodiments of the claimed invention.  Both the
13 1984 and 1985 applications refer to the preferred embodiment as
14 an "example" of the invention, and emphasize that "these examples
15 are not intended to limit the invention in any manner."  <u>Id.</u> at
16 10: 1-5.  The 1985 application, which contains the broad
17 definition of "monoclonal antibody" adopted by the '561 patent,
18 is even more explicit on this point.[13]

19           In <u>Rexnord Corp. v. Laitram Corp.</u>, 274 F.3d 1336 (Fed.

20

21      [13]    Genentech argues that the definition in the 1985
   application expands the scope of "monoclonal antibody" beyond the
22 meaning of the term as it was used in the 1984 application.
   However, the prosecution history reveals that both Chiron and the
23 PTO understood the definition in the 1985 application to be
   consistent with the scope of the 1984 application.  When Chiron
24 proposed to define "monoclonal antibody" in the '561 patent to
   encompass the same subject matter as encompassed in the priority
25 applications, it specifically cited the examiner to the 1985
   application.  (<u>See</u> Chiron Markman Ex. 175 at tab 156.)  Thus,
26 Chiron represented to the PTO that all priority applications,
   including the 1984 application, fell within the definition of
27 "monoclonal antibody" in the 1985 application.  As Magistrate
   Judge Hollows correctly concluded, this "renders the statement to
28 the Examiner less than and 'clear disavowal' of its presently
   asserted interpretation." (F & R's at 28.)

                                23

1  Cir. 2001), the Federal Circuit refused to limit the invention to
2  the preferred embodiment where the patent contained similar non-
3  limiting language:

4          The written description explicitly states that aside
           from the preferred embodiment, "[t]he invention is
5          capable of other embodiments and of being practiced and
           carried out in different ways." . . . . These phrases
6          reflect the inventor's teaching that his invention
           could be embodied "in various ways." Finally, the
7          inventor explicitly qualified his detailed "Description
           of a Preferred Embodiment" by stating that "it is to be
8          understood that the invention is not limited in its
           application to the details of construction and the
9          arrangements of components or illustrated drawings."
           Id. at 1345 (internal citations to patent omitted).
10
11 Similarly, the text of the 1984 and 1985 applications teaches
12 that the claimed antibodies are not limited to the disclosed
13 embodiment.  Contrast North American Vaccine, Inc. v. American
14 Cyanamid Co., 7 F.3d 1571, 1576 (Fed. Cir. 1993)(limiting the
15 invention to one type of linkage because the specification taught
16 that other linkages were "unlikely" or "not significant"); O.I.
17 Corp. v. Tekmar Corp., 115 F.3d 1576 (Fed. Cir. 1997)(finding
18 that the term "passage" in a patent for an apparatus for removing
19 water vapor from a sample did not include smooth-walled passages,
20 where the specification stated "although a threaded configuration
21 is shown, other non-smooth geometries may be used to remove water
22 vapor," and therefore only contemplated non-smooth geometries);
23 Tronzo v. Biomet, Inc., 156 F.3d 1154, 1158 (Fed. Cir.
24 1998)(holding that the invention was limited to the conical
25 prosthetic hip sockets described in the specification, where the
26 specification "[did] not attempt to identify other, equally
27 functional shapes or talk in terms of a range of shapes.").
28          Moreover, it is clear from those applications that the

                                   24

1  importance of the invention is not its murine hybridoma-derived
2  structure, but its ability to selectively bind to human breast
3  cancer cells, and its usefulness as an effective therapeutic
4  against cancer.  See 1984 Application, at 5: 1-7 (listing the
5  "important characteristics of the monoclonal antibodies," without
6  any mention of their hybridoma-derived structure).

7          Genentech therefore cannot successfully argue that the
8  murine hydridoma-derived structure was essential to the
9  invention.  The priority applications do not support reading such
10 a limitation into the broad language of the claims in the issued
11 patent.

12                  b.   Rejections by the PTO

13         Genentech argues that not to limit the definition of
14 "monoclonal antibody" gives Chiron a claim scope that was
15 repeatedly rejected by the PTO during the application process.
16 This argument misrepresents much of what occurred during the
17 prosecution history, and fails to acknowledge Chiron's non-
18 acquiescence with these rejections.

19                 i.   Functional Equivalent Claims

20         The 1984 and 1985 applications, as well as a subsequent
21 continuation in part application filed in 1986, attempted to
22 claim monoclonal antibodies and their "functional equivalents."
23 The "functional equivalent" claims were rejected each time by the
24 PTO on the grounds that the term was indefinite and not enabled
25 by the disclosure in the specification.  According to Genentech,
26 this history indicates that the PTO believed the claims were
27 limited in scope to murine hybridoma derived monoclonal
28 antibodies.  However, in setting forth the reasons for the

                                25

1  rejection, the Examiner never explained why the functional
2  equivalent claims were not enabled, and never stated that the
3  priority applications were limited to antibodies with murine
4  hydbridoma derived structures.  See Rexnord, 274 F.3d at 1345
5  ("It is significant that the examiner made no explicit reference
6  to [the disputed claim scope] in rejecting the claim.")  Rather,
7  the Examiner focused on the indefinite nature of the claims:

8         Claim 2 is indefinite as to the scope of the term
        "functionally equivalent." Which function(s) need to be
9         equivalent to be included in this claim. [sic.] For
        example, which of the following are functionally
10        equivalent: monoclonal/antibody able to (1) fix
        compliment, (2) bind to a human cell, (3) specifically
11        bind to any human carcinoma, (4) binds only to breast
        carcinoma, (5) binds to the same antigen on or in the
12        cell, (6) binds to the same site on the same antigen,
        or (7) the same isotype binding to the same eptiope?
13        (Chiron Markman Ex. 175 tabs 7, 26.)

14  Thus, contrary to Genentech's assertions, the Examiner's
15  rejection of the functionally equivalent claims tells us little
16  about the proper scope of the priority applications and the
17  issued patent.  Moreover, Chiron never acquiesced in the
18  rejection or "clearly disavowed" a claim scope that would cover
19  functional equivalents.  See York Products, 99 F. 3d at 1575.  In
20  fact, Chiron withdrew the claims to functional equivalents
21  stating that it was doing so "without prejudicing applicant's
22  rights to antibodies having equivalent properties."  (Chiron
23  Markman Ex. 175, at Tab 55.)  Ultimately, Chiron was issued both
24  the '774 patent and '561 patent without the adjective "murine" in
25  claims to monoclonal antibodies.  (See Chiron Markman Ex., at Tab
26  101.)
27  ///
28  ///

1

ii.   Single Chain Antibody Claims

2       Genentech next points out that during the prosecution
3 of the 1995 application, the PTO rejected claims to nucleic acid
4 molecules "encoding a humanized, single chain antibody" on the
5 basis that they were preempted by prior art. (Chiron Markman Ex.
6 175 at Tab 140, p. 4.)   The patent examiner explained that these
7 claims "only have a priority date, 06/07/1995 because the claimed
8 invention is not disclosed in the parent cases." (Id. at p. 6.)

9       The examiner obviously did not believe that single
10 chain humanized antibodies were supported by the priority
11 applications.   The examiner was silent, however, about whether
12 humanized antibodies having the usual four-chain antibody
13 structure were encompassed by the priority applications.[14]
14 "Drawing inferences of the meaning of claim terms from an
15 examiner's silence is not a proper basis on which to construe a
16 patent claim." De Marini Sports, Inc. v. Worth, Inc., 239 F.3dd
17 1314, 1326 (Fed. Cir. 2001).   Therefore, the rejection of claims
18 to single chain humanized antibodies does not justify limiting

19

20 [14]   The prior art cited by the patent examiner discusses
single chain humanized antibodies as distinct from humanized
21 antibodies with four chains.   (See Chiron Markman Ex. 175 at Tab
140)(citing Ladner, et. al., U.S. Patent No. 4,946,778, August 7,
22 1990).   The Ladner patent, for example, describes the advantages
of single chain antibodies over recombinantly manufactured
23 multiple chain antibodies: "[A]ntibodies are three-dimensional
aggregates of two heavy and two light chains. . . . In order to
24 produce such complex materials by recombinant DNA technology . .
., it becomes necessary to clone and express a gene coding for
25 each one of the different kinds of polypeptide chains. . . . The
approach . . . necessitates expression of multiple genes, and as
26 indicated, in some cases, multiple and different hosts.   These
approaches have proven to be inefficient. . . . [Therefore], it
27 would indeed be greatly advantageous to be able to produce, by
genetic engineering, single polypeptide chain binding proteins
28 having the characteristics and binding ability of multi-chain
variable regions of antibody molecules."

27

1 | the term "monoclonal antibody" to exclude four-chain humanized
2 | antibodies.

3 | ### iii.  Cell Line Claims

4 | Finally, Genentech relies on Chiron's failed attempt to
5 | add claims to cell lines.  After the monoclonal antibody claims
6 | had been allowed, but before the patent issued, Chiron sought to
7 | add new claims for hybridoma processes, as well as a claim for a
8 | monoclonal antibody "prepared by a process [involving] a cell
9 | line capable of producing the monoclonal antibody" and a claim
10 | for the cell line itself. (See Chiron Markman Ex. 175, Tab 157.)
11 | The patent examiner rejected the cell line claims on the basis
12 | that they did "not find support in the specification as well as
13 | in the priority specification," and asked Chiron to "resubmit . .
14 | . with claims only to the hybridomas and the antibodies produced
15 | by hybridomas."  (Id., Tab 162.)   Chiron resubmitted the proposed
16 | amendment with only claims to hybridomas, which were allowed.
17 | (Id., Tab 159.)

18 | The term "cell line" is broader than "hybridoma" and
19 | could include recombinant, genetically engineered cell lines such
20 | as those used to produce a humanized antibody.  Accordingly,
21 | Genentech argues that the rejection of the cell-line claims
22 | indicates that the patent examiner did not consider humanized
23 | antibodies to be within the scope of the patent.

24 | Genentech's argument would have more force if it were
25 | not for the timing of the rejection.  Before rejecting the cell
26 | line claims, the examiner had already allowed the claims to
27 | monoclonal antibodies on the understanding that they had the same
28 | scope as the priority applications, and without taking any

28

1  limiting action with respect to the broad definition of
2  monoclonal antibody found in the 1995 application.  As discussed
3  above, both this definition and the priority applications suggest
4  that a monoclonal antibody is nothing more or less than a
5  homogeneous population of antibodies.

6       The proposed claims to cell lines were narrower,
7  dependent claims containing additional "process" limitations on
8  the product (monoclonal antibody) that had already been accepted
9  by the PTO.[15]  Because the proposed cell line claims imposed
10 additional "process" limitations on the invention, any rejection
11 of those claims has little bearing on the scope of the broader,
12 allowed claims.  It would be improper for the court to read a
13 limitation into the broad monoclonal antibody claims because
14 narrower claims to cell lines were rejected.  See Ethicon Endo-
15 Surgery v. United States Surgical Corp., 93 F.3d 1572, 1582 n.7
16 (Fed. Cir. 1996)(finding that the examiner's rejection of a
17 narrow claim because it was not supported by the disclosure could
18 not be used to limit a broad claim to the disclosed

21 [15]    There are three ways an inventor may seek protection
22 for his invention under the patent laws: product claims, process
   claims, and product by process claims.  A "product" claim is
23 defined in terms of its physical and structural characteristics,
   and is not limited by the process in which it is made.  A
24 "process" claim is directed toward the method of manufacture used
   to make a given product.  The hybrid "product by process" claim
25 is one in which a product is claimed in terms of the process by
   which it is made.  See Amgen Inc. v. Chugai Pharm. Co., 706 F.
26 Supp. 94, 103-104 (D. Mass. 1989) aff'd in part and rev'd in part
   on other grounds, 927 F.2d 1200 (Fed. Cir. 1991)(describing the
27 difference between product and process claims).  These three
   types of claims are not mutually exclusive, and it is not
28 uncommon for a patentee to seek all three types of claims to
   maximize protection for his invention.

1  embodiment.);[16] Markman, 52 F.3d at 979 ("Although the
2  prosecution history can and should be used to understand the
3  language used in the claims, it . . . cannot 'enlarge, diminish,
4  or vary the limitations in the claims.'")(quoting Goodyear Dental
5  Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880)).

6       Plant Genentic Systems N.V. & Biogen, Inc. v. Dekalb
7  Genentics Corp., 175 F. Supp. 2d 246 (D. Conn. 2001), cited by
8  Genentech, is inapposite.  In that case, the court held that
9  "plant" was limited to dicotyledonous plants, because during
10 prosecution the examiner expressed his view that the
11 specification did not enable the invention as to monocotyledonous
12 plants.  Id. at 268.  Not only did this happen before the patent
13 examiner allowed the claims to "plants," the discussion that took
14 place directly referenced the claims in dispute.  Id.  ("there
15 can be little question from the exchanges between the examiner
16 and the applicants that the issue of whether the plant . . .

17

18      [16]   "[T]he district court confused a claim supported by the
   specification, which is not allowable, with a broad claim, which
19 is.   Claim 1 was properly rejected because it recited an element
   not supported by [the] disclosure, i.e. a lockout 'on the
20 stapler.'  It does not follow, however, that [the] disclosure
   could not support claims sufficiently broad to read on a lockout
21 off of the cartridge. . . .  If Fox did not consider the precise
   location of the lockout to be an element of his invention, he was
22 free to draft claim 24 broadly (within the limits imposed by the
   prior art) to exclude the lockout's exact location as a
23 limitation of the claimed invention . . . Such a claim would not
   be unsupported by the specification even though it would be
24 literally infringed by undisclosed embodiments.  The district
   court should not have imposed on claim 24 an additional
25 limitation which it does not contain."  Ethicon, 93 F.3d at 1582
   n.7 (internal citations omitted)(emphasis added).   Though
26 somewhat counter-intuitive, the Federal Circuit's reasoning is
   that a broad claim encompasses even subject matter that cannot be
27 specifically claimed.  Thus, a rejection of a narrow claim
   because it is not supported by the disclosure cannot be used to
28 limit issued claims that are written broadly.

1 claims would cover both dicots and monocots arose on several
2 occassions").

3       Here, the exchange between the patent examiner and
4 Chiron took place after the claims to monoclonal antibodies had
5 been allowed, and without reference to the meaning or scope of
6 "monoclonal antibody."  The relevance of the examiner's rejection
7 to the already allowed monoclonal antibody claims is ambiguous at
8 best.  Absent a more detailed explanation of the reasons for
9 rejection, the court will not guess at what was in the mind of
10 the patent examiner.  See Rexnord, 274 F.3d 1348 (refusing to
11 deviate from broad interpretation of claim terms where
12 prosecution history was "inconclusive"); Markman v. Westview
13 Instruments, Inc., 52 F.3d 967, 985 ("Of course the views of the
14 [PTO] are generally not obtainable, except as reflected in the
15 prosecution history.")

16       Moreover, nothing about Chiron's response to the
17 rejection of the second proposed amendment can be considered a
18 "clear disavowal" or "disclaimer" of claim scope by Chiron.
19 Entry of a post-allowance amendment is completely discretionary.
20 If the amendment is rejected, the applicant has no right to
21 appeal and is not entitled to a detailed explanation of the
22 reasons for the rejection.  See Ex parte Stone, 1902 C.D. 434
23 (Comm'r Pat. 1902); Ex parte la Bore, 145 U.S.P.Q. 494 (Bd. App.
24 1964); 3 Lester Horowitz, Patent Office Rules and Practice §
25 312a[4] at 31-8 (2001).  Because Chiron could not appeal the
26 rejection of the proposed amendments, it cannot be said to have
27 acquiesced in the patent examiner's rejection.

28       Therefore, the court adopts Magistrate Judge Hollows'

1 finding that rejected amendments went to 'process' and 'product
2 by process' claims "that did not affect the pure 'product' claims
3 at issue in this litigation." (F & Rs at 29). The court agrees
4 with Magistrate Judge Hollows' conclusion that the patent
5 examiner thus "left intact the product claims . . . as well as
6 the examiner's prior analysis for allowance which did not limit
7 the claims to hybridoma (murine) based antibodies." (Id. at 29-
8 30). Thus, both the '561 patent and the priority applications
9 define "monoclonal antibody" broadly to encompass non-hybridoma
10 derived, non-murine antibody structures.

11                        c.  Schering/Kopykake

12         Genentech contends that if the court interprets the
13 1984 and 1985 applications to encompass humanized antibodies, it
14 will in effect allow Chiron to claim an invention it did not
15 make. Citing two recent federal circuit decisions, Schering
16 Corp. v. Biogen, Inc., 222 F.3d 1347 (Fed. Cir. 2000), and
17 Kopykake Enterprises, Inc. v. The Lucks Co., 264 F.3d 1377, 1383
18 (Fed. Cir. 2001), Genentech argues that the phrase "monoclonal
19 antibody" cannot encompass humanized antibodies because humanized
20 antibodies had not been discovered in 1984.[17]  However, neither
21 case cited by Genentech is on point.

22         Schering involved a patent for recombinant DNA
23 molecules encoding what was originally described in the patent
24 application as a "leucocyte interferon." A leucocyte is a white
25 blood cell. Leucocytes produce interferons, which are molecules

27     [17]   Antibodies produced through recombinant technology were
28 first discussed in 1984. A humanized antibody was developed in
the late 1980s.

32

that help the body fight viral infections and tumors by
immunizing healthy cells. At the time of the invention,
scientists thought that leukocytes produced only one interferon
having a specific amino-acid sequence. That interferon, along
with its amino-acid sequence, was the subject of the claims in
the initial application. Subsequently, it was discovered that
leucocytes produce numerous interferons. Scientists therefore
revised the nomenclature so that "leucocyte interferon" referred
to the source of the interferon, while "IFN-alpha" was used to
refer to a category of interferons produced by leucocytes. Due
to these changes, the inventor amended the patent to substitute
the term "leucocyte interferons" with the term "polypeptide of
the IFN-alpha type."

        Later, the owner of the patent tried to argue that the
patent claimed all interferons falling within the IFN-alpha
category. The court rejected this contention because "the
patentee expressly limited the term 'IFN-alpha' to define the
leucocyte interferon described in the initial application." Id.
at 1353. The interferon described in the initial application was
a single, specific polypeptide; therefore, the court reasoned,
persons skilled in the art would not interpret the invention to
claim the later-discovered interferons, which had different
amino-acid sequences. "Because, at the time of the '901
application neither [the inventor] nor others skilled in the art
knew of the existence of, let alone the identity of, the specific
polypeptides now identified as subtypes of IFN-alpha, those
subtypes cannot be within the scope of the claims." Id. at 1353.
Thus, the term "did not and could not enlarge the scope of the

1   patent to embrace technology arising after its filing."  Id.  The
2   court concluded that "to grant broader coverage "would reward
3   [the inventor] for inventions he did not make."  Id. at 1354.

4           The similarities between this case and Schering are
5   superficial.  Like the inventor in Schering, Chiron defined the
6   disputed term with reference to the way that term was initially
7   used.  However, as discussed at length above, in this case,
8   neither the priority applications nor the PTO placed any express
9   limitations on the meaning of the term.  Unlike the claims in
10  Schering, the claimed monoclonal antibodies of the priority
11  applications are not directed toward molecules described by
12  specific amino acid sequences.  Rather, they are expressly
13  defined by (1) their homogeneity, and (2) their ability to bind
14  to specific human breast cancer antigens.  These characteristics
15  do not depend on whether the antigen is humanized or murine in
16  structure (although at a molecular level murine and humanized
17  antibodies are undoubtedly different in structure to a degree).
18  Whereas the inventors in Schering were attempting to claim a
19  completely different invention than what was claimed in the
20  initial application, Chiron is claiming the same invention
21  described in the priority applications: a homogenous preparation
22  of antibodies capable of binding to human breast cancer antigens.

23          The full relevance of Schering to this case cannot be
24  appreciated without reference to the extrinsic evidence in the
25  record.  This evidence reveals that, unlike the meaning of
26  "leucocyte interferon," the meaning of "monoclonal antibody" has
27  not changed since 1984/1985.  Chiron's expert, Dr. Lanier,
28  testified that the understanding of "monoclonal antibody" to

34

1 those skilled in the art is consistent with the definition in the
2 '561 patent, and has been so since 1984/1985.  Genentech's
3 expert, Dr. Unkeless, agreed that the meaning of "monoclonal
4 antibody" had not changed, but testified at the hearing that
5 humanized and chimeric antibodies are not understood to be the
6 same thing as monoclonal antibodies.  This testimony was
7 substantially impeached on cross examination by numerous
8 references in the literature (including some of Genentech's own
9 publications) in which humanized and chimeric antibodies were
10 referred to as monoclonal antibodies.[18]  In light of these
11 references, Dr. Unkeless began to refer to his conclusions as his
12 "personal view," rather than the objective understanding of one
13 skilled in the art.  Like Magistrate Judge Hollows, this court is
14 persuaded by Dr. Lanier's testimony that one skilled in the art
15 would consider any homogeneous population of antibodies to be
16 monoclonal.  (See F & R's at 35.)  Thus, Chiron is not claiming a
17 different invention than that disclosed in the priority

18

19       [18]     Patents and publications referring to genetically
20 engineered humanized antibodies as "monoclonal" date from the
1990s.  Genentech suggests that therefore these publications have
no bearing on the meaning of "monoclonal antibody" to one skilled
21 on the art in 1984 and 1985.  To the contrary, given the
testimony of both experts that the meaning of "monoclonal
22 antibody" has not changed, its use in 1990 must be consistent
with its use in 1984 and 1985.  Therefore, the term must have
23 been understood broadly in 1984 and 1985 to mean nothing less
than a homogeneous population of antibodies.  Moreover, in 1984
24 and 1985, methods other than hybridoma methods were being used to
produce monoclonal antibodies.  (See Markman Tr. at 31:20- 32:3,
25 testimony of Dr. Lanier regarding four ways of making monoclonal
antibodies known in the art in 1984).  By November of 1984,
26 scientists had published articles about chimeric antibodies.
(See Chiron Markman Ex. 5, Morrison article discussing chimeric
27 antibodies).  Thus, one skilled in the art in 1984 and 1985 would
have understood a "homogenous population of antibodies" to
28 include not just murine, hybridoma derived antibodies.

35

applications; Chiron is merely claiming a later-developed embodiment of the same invention.[19] See Amgen Inc. v. Chugai Pharm. Co., 706 F. Supp. 94, 103-104 ("Although the development of recombinant technology provides the scientific and commercial communities with innovative techniques for manufacturing certain products and compositions, the patent protection of product claims has not changed."); Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565 (Fed. Cir. 1991)(upholding district court's finding that claims to purified blood clotting factor, Factor VIII:C, encompassed "any Factor VIII:C preparation, regardless of how produced, having the same material and functional characteristics as the plasma-derived preparation.") .

As Chiron points out, the Schering court did not state that it overruled a long history of Federal Circuit decisions holding that an applicant is not required to do the impossible and "describe in the specification every conceivable and possible future embodiment of his invention." See Rexnord, 274 F.3d at 1344; SRI Int'l v. Matsushita Elec. Corp., 775 F.3d 1107, 1121 (Fed. Cir. 1985). Rather, Schering appears to carve out an exception to this rule in cases where the inventor has expressly limited the claims to particular embodiments known at the time of the invention.

For similar reasons, Kopykake, 264 F.3d 1337, is also

---

[19] It is true, as Genentech points out, that Dr. Lanier testified at the Markman hearing that the named inventors of the '561 patent did not invent humanized antibodies. (See Mar. 6, 2002 Markman Tr., at 77:3-10.) However, Dr. Lanier was not testifying as an expert in patent law, and the court will not impute a legal conclusion into his testimony.

1 inapposite.  Kopykake involved a patent that claimed a method for
2 "screen printing" decorations onto food stuffs.  At issue was
3 whether the term "screen printing" was broad enough to include
4 ink jet printing.  The court began its analysis by looking to the
5 specification, which defined "screen printing" to include "any
6 other conventional methods" of printing pictorial images onto
7 food.  Because it was not "conventional" at the time of the
8 invention to use ink jet printing to print images on food, the
9 court held that "screen printing" did not encompass ink jet
10 printing.  Id. at 1383-84.  Thus, the court stated that "when a
11 claim term understood to have a narrow meaning when the
12 application is filed later acquires a broader definition, the
13 literal scope of the term is limited to what it was understood to
14 mean at the time of filing."  Id.

15           In Kopykake, the fact that the specification was
16 expressly limited by its terms to "conventional printing
17 processes" carried dispositive weight.  Because what is
18 "conventional" necessarily changes over time, and because patents
19 must be construed at the time of their filing, the Kopykake
20 patent could only be understood by reference to conventional
21 methods at the time of the patent's filing.  In contrast, the
22 priority applications in this case have no similar teaching that
23 their claims are limited to what was "conventional" at the time.
24 Moreover, as discussed above, the meaning of "monoclonal
25 antibody" has not changed since those applications were filed.[20]

26

27 [20]    Magistrate Judge Hollows distinguished Kopykake on the
28 grounds that it involved a process patent, while this case
   involves a product patent.  The court is not convinced that

37

1  Therefore, the 1984 and 1985 applications do not limit the broad
2  definition of monoclonal antibody found in the '561 patent to
3  homogeneous populations of antibodies having structures that can
4  be made by murine hybridomas.

5      Accordingly, the court adopts the definition of
6  monoclonal antibody proposed by Magistrate Judge Hollows:

7          **The term "monoclonal antibody" means an antibody**
           **composition having a homogeneous (essentially**
8          **identical) antibody population.  The term is not**
           **limited regarding the species or source of the**
9          **antibody, nor is it limited by the mannner in which it**
           **is made.  For example, the term includes monoclonal**
10         **antibodies produced by a methodology other than**
           **hybridoma which results in monoclonal antibodies no**
11         **matter how subcategorized, e.g., hybrid, altered,**
           **chimeric, or humanized.  The term includes variants**
12         **that naturally arise during the production of**
           **monoclonal antibodies.  The term includes whole**
13         **immunoglobulins.**

14     B.   **"Binds"**

15     The parties also dispute the meaning of the term
16  "binds" as it is used in the patent claims.  See e.g. '561
17  Patent, Claims 1, 9("A monoclonal antibody that binds to a human
18  breast cancer antigen . . .");'561 Patent, Claim 19("A monoclonal
19  antibody that binds to human c-erbB-2 antigen)(emphasis added).

20     The term "bind" has a specific meaning to those skilled
21  in the art of microbiology.  As previously discussed, the antigen
22  binding sites on an antibody are custom-tailored to attach or
23  "bind" to a specific receptor site on the antigen, much the way a
24  lock and key fit together.  However, sometimes an antibody will
25  randomly and weakly attach at a site other than the specific one
26  recognized.  Both parties agree that the term "binds" as used in

27  _____

28  Kopykake is distinguishable on these grounds, since its sister
    case, Schering, was a product case.

                            38

the patent does not refer to this random, background binding; it would make little sense for Chiron to patent an antibody that bound at random to human breast cancer cells.  Thus, the parties agree that one skilled in the art in 1984 and 1985 would interpret the term "bind" to mean the attachment between an antibody and antigen that occurs at the specific antigen-binding site.

The parties' agreement ends there.  Genentech contends that the term should be construed to mean a degree of attachment greater than background levels, while Chiron argues that the term should be construed more narrowly to refer to a degree of attachment that is immunologically significant given the purposes of the invention.

The specification does not define the term "binds," but "immunological binding" is defined as "the non-covalent interactions of the type which occur between an immunoglobulin molecule and an antigen for which the immunoglobulin is specific."  This definition suggests that specificity is an important aspect of binding, but nothing more.  Thus, on its face, it is consistent with Genentech's interpretation of the term binds.

However, a reading of the patent as a whole reveals that the term "binds" as used in the claims has a more precise meaning.  Claim terms should be construed in accordance with the purposes of the claimed invention.  See Reinshaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1251 (Fed. Cir. 1998); CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1160 (Fed. Cir. 1997).  In addition, where alternative interpretations

1  exist, the court should not construe the patent in a way that
2  would render it useless.  Process Control Corp. v. Hydreclaim
3  Corp., 190 F.3d 1350, 1356 (Fed. Cir. 1999).

4          In this case, the invention claimed in the '561 patent
5  relates to antibodies that are "useful in specific binding
6  assays, affinity purification schemes, drug or toxin targeting,
7  imaging, and genetic or immunological therapeutics for various
8  cancers . . . ."  '561 Patent, 1:27-31.  For these uses, it is
9  important that the antibody does more than just specifically bind
10 to the antigen of interest.  Sometimes, antigens that are present
11 in high numbers on cancer cells are also present in lower numbers
12 on normal, healthy cells.  Thus, if an antibody used for cancer
13 diagnosis attaches to normal tissue in addition to cancer cells,
14 it will give false positives.  Similarly, an antibody used for
15 therapy that is incapable of distinguishing between normal and
16 cancerous tissue can have fatal effects.  In cancer treatment,
17 toxins are attached to the antibodies so that when the antibodies
18 bind with cancer cells, the toxin kills that cell.  If the
19 antibodies also attaches to healthy cells, it can kill the
20 healthy cells.

21         Accordingly, the patent states that "it is desirable to
22 target malignant lesions while avoiding normal tissue."  Id. 1:
23 67-4.  The ability of an antibody to target a specific type of
24 cell or tissue to the exclusion of others is called
25 "selectivity."  As is evident from the stated purposes of the
26 invention, selectivity in binding is an important aspect of the
27 claimed invention.

28         "Affinity," or strength of binding, is also an

40

1 important aspect of the invention. An antibody that binds weakly
2 to an antigen will not be particularly useful in therapy or
3 diagnosis. Thus, the specification begins by stating that "[i]t
4 is an object of the invention to provide novel compositions that
5 are derived from the antigen-biding sites of immunoglobulins
6 having affinity for cancer antigens." ('561 Patent Col 3:30-
7 33)(emphasis added).

8 The methods described in the specification for making
9 the invention confirm that the inventors were concerned with
10 isolating antibodies with specificity, affinity, and selectivity
11 for breast cancer antigens. See '561 Patent, 15:34-45
12 ("monoclonal antibodies capable of binding specifically to a
13 human tumor antigen . . . were produced . . . ."); id. at 16:43-
14 45 ("Wells that gave a reaction on the breast cancer membrane
15 extract of greater than 0.7 O.D. were saved."); id. at 16:63
16 ("Hybridoma wells showing strong fluorescent binding to breast
17 cancer cells but no fluorescent binding to fibroblasts were
18 saved."); id. at 17:38-42 ("Antibodies were deemed to bind
19 selectively to breast cancer if they bound strongly to less than
20 about 1/3 of the normal tissues and blood cell types"); id. at
21 18:31 (describing how the inventors ran the isolated antibodies
22 through a series of immunoassays[21] to "evaluate their selectivity
23 for breast cancer"); id. at 25:35-45 (describing tests to termine
24 the "affinity constant," which measures the affinity of binding).
25 Reading the patent as a whole, one skilled in the art would
26 understand the term "binds" to mean a degree of attachment that

27

28 [21] The term "immunoassay" as used in the patent is
construed below.

41

1  is immunologically significant in the context of the uses for the

2  monoclonal antibody described in the patent.[22]

3        Therefore, the court adopts the following construction

4  of "binds":

5        **The term "binds" refers to a degree of attachment that**
**is immunologically significant, i.e. a degree of**
6        **attachment that is (1) above background levels; (2)**
**specific; (3) selective for cancer as opposed to normal**
7        **cells and/or tissues; and (4) has a useful degree of**
**affinity.**

8

9        This definition departs slightly from the construction

10  recommended by Magistrate Judge Hollows.  He proposed that

11  "except where the context of 'binding expressly indicates a

12  phenomenon of isolated, random attachment, "binds" refers to a

13  degree of attachment that is immunologically significant in the

14  context of the uses for the monoclonal antibodies described in

15  the patent."  (F & R's at 39-40.)  In an effort to promote

16  clarity, the court's construction defines what is meant by

17  "immunologically significant," something that the proposed

18

19        [22]   Genentech argues that the court should construe the
20  term to mean binding that is greater than background binding
because Chiron's expert, Dr. Lanier, testified that
21  "immunologically relevant" binding refers to binding that is
"greater than background binding."  First, it is unnecessary for
22  the court to rely on extrinsic evidence in the form of expert
testimony to construe the term.  Second, Genentech ignores other
23  statements by Dr. Lanier that indicate more than mere specificity
is required for immunologically relevant binding.  See Transcript
24  of Proceedings, Vol. 2, at 17 ("Q: is a certain level of affinity
required for what you referred to earlier as immunologically
25  relevant binding? A: Yeah.  In fact . . you want something which
binds much stronger in order to have good resolution powers for
26  selectivity and specificity.")  Third, the term "specificity" as
used by Dr. Lanier incorporates the idea of affinity: ("Q: Could
27  you explain what [specificity] means? A: [S]pecificity comes back
to this lock and key idea where . . . the antibody specifically
28  binds quite firmly and specifically to its particular
antigen.")(emphasis added).

42

1  construction does not do.  In addition, the court's construction
2  omits the first phrase of the proposed definition, which is
3  unnecessary and may be confusing.  The question is not how the
4  term is used elsewhere in the patent specification, but how it is
5  used in the terms of the claims.  Although the specification
6  sometimes uses "binds" to refer to background binding, the claims
7  universally use "binds" in the sense of immunologically
8  significant binding.  See Pitney Bowes, Inc. v. Hewlett Packard
9  Co., 182 F.3d 1298, 1311 (Fed. Cir. 1999)("In circumstances such
10 as this, where the language of the written description is
11 sufficient to put a reader on notice of the different uses of a
12 term. . . it is appropriate to depart from the normal rule of
13 construing seemingly identical terms in the same manner.  This
14 entirely accords with the public notice function of claims.").

15     C.  **"Human Breast Cancer Antigen That is Also Bound by**
16         **Monoclonal Antibody 454 C11"**

17          The court has also been asked to construe the term
18 "antigen" as it is used in Claim 1 of the patent.[23]  The antigen
19 of Claim 1 is described by reference to the monoclonal antibody
20 454 C11:

21          A monoclonal antibody that binds to a human breast
            cancer antigen that is also bound by monoclonal
22          antibody 454 C11 which is produced by the hybridoma
            deposited with the American Type Culture Collection
23          having Accession No. HB 8484.
            '561 Patent, Claim 1.
24

25          Chiron contends that the referenced antigen is human c-
26 erbB-2, which is sometimes referred to as HER2.  This argument is
27

28     [23]     The parties agree that generally, an antigen refers to
        any substance that may be specifically bound by an antibody.

                              43

1  based on the text of the patent specification, which describes
2  laboratory tests showing that antibody 454 C11 bound to c-erb-B2:

3                    Immunoprecipation tests on the antibodies indicated
                     that seven of them (454 C11 . . . 520 C9 . . .) bind a
4                    common monomeric c.a. 210,000 dalton protein found in
                     cancerous breast tissue. . . .  The 520 C9 antibody
5                    binds an approximately 200 kD protein found in
                     cancerous breast tissue which has been identified as c-
6                    erbB-2 . . . . The 200kD proteinaceous antigen bound by
                     monoclonal antibody 520 C9 is identical to the 210 kD
7                    antigen mentioned herein above . . . .  The 200,000
                     dalton protein bound by 520 C9 and 454 C11 was
8                    designated as the 210,00 dalton protein in U.S. Pat.
                     No. 4,753, 894.
9                    '561 Patent at 27:1-17.

10         Thus, the patent states that 454 C11 binds to a 210kD
11  antigen that is identical to the 200kD antigen that has been
12  identified as c-erbB-2.  All parties agree that c-erbB-2 is
13  synonymous with HER2.   Therefore, when claim 1 refers to the
14  antibody bound by 454 C11, it is referring to the antibody known
15  as c-erbB-2 or HER2.

16         Genentech argues that whether the referenced antigen
17  is actually human c-erbB-2 is a factual question that the court
18  should not resolve at this time.  The court does not purport to
19  resolve this question as a factual matter, however.  The court is
20  simply relying on the express language in the specification
21  equating the antigen bound by 454C 11 with human c-erbB-2.  Even
22  if it were necessary to resort to extrinsic evidence, experts for
23  both parties appear to agree that the antigen referred to in
24  claim 1 is, in fact, c-erbB-2. (See 3/7 Markman Tr. at 28:17-25).
25  Therefore the court adopts Magistrate Judge Hollows' recommended
26  construction of the phrase containing the referenced antigen:
27  ///
28  ///

44

1

2

3

4

**The claimed monoclonal antibodies bind to the same breast cancer antigen as the identified reference antibody produced by the identified hybridoma. The 454 C11 monoclonal antibody binds to the human breast cancer antigen now referred to as "c-erB-2," sometimes referred to as "HER2."**

D.   **"Strong Staining"**

5

6

7

The term "strong staining" appears in several dependent claims. Claim 2 is representative:

8

9

10

11

The monoclonal antibody of claim 1, wherein the monoclonal antibody exhibits strong staining intensity as determined an immunoassay with three or less of the normal tissues and blood cells selected from the group consisting of pancreas, esophagus, lung, kidney, colon, stomach, brain, tonsil, liver, heart, ovary, skin, breast, platelets, red cells, lymphocytes, monocytes and granulocytes.
'561 Patent, Claim 2.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Genentech's initial claim construction brief proposed that "strong staining" means staining that is more than weak. (Genentech Claim Construction Brief at 33). In light of Magistrate Judge Hollows' findings and recommendations, Genentech now argues that the court should construe "strong staining" to refer to a "clear, definite, readily detectable signal." (Genentech Opp'n to F & R's at 18.) Chiron, on the other hand, construes "strong staining" to mean "a clear and definite, intense readily detectable signal resulting directly or indirectly from an interaction between an antibody and antigen, for example a color change as determined by light microscopy or a change in fluorescence determined by FACS. 'Strong staining' does not encompass staining that is less than strong, such as weak or moderate staining." (Chiron Opp'n to F & R's at 5.)

27

28

Staining is used by those skilled in the art to determine how many antibodies are interacting with antigens on a

45

1   particular tissue or cell.[24]  Staining involves tagging
2   antibodies with a stain so that they "signal" their attachment to
3   an antigen on a cell or tissue by staining that cell or tissue.
4   This can be accomplished either directly (by attaching the tag to
5   the antibody of interest) or indirectly (by attaching the tag to
6   another antibody that will bind to the antibody of interest).
7   Stronger staining occurs when many antibodies attach to the
8   surface of a cell or tissue.  Given the common understanding of
9   how staining works, the construction proposed by Genentech is
10  incomplete in that it does not convey that the signal results
11  from an interaction between an antibody and an antigen.

12          Genentech's proposed construction also fails to clarify
13  the important question of whether "strong staining" includes
14  moderate staining, an issue which the parties debated at length
15  during the Markman Hearing.  The '561 patent specification
16  contains a series of tables that grade staining intensity on a 0-
17  1-2 scale, 0 being "negative," or no staining, 1 being "weak"
18  staining, and 2 being "strong" staining.  Genentech has taken the
19  position that the grading system described in the patent
20  indicates that "strong" means "not weak," while Chiron has argued

21

22          [24]    The degree of staining is important in ascertaining the
23  selectivity of a particular monoclonal antibody (i.e. the degree
    to which the antibody binds to the cancer antigen of interest but
24  not to normal tissues).  The more antibodies that attach to
    normal tissue, and the more normal tissues to which they attach,
25  the less value the antibodies will have for diagnosis and
    treatment.  Thus, the patent claims monoclonal antibodies that
26  exhibit strong staining with only a small percentage of normal
    tissues and cells.  See '561 Patent, Claim 2 (claiming antibodies
27  that exhibit strong staining with no more than three of eighteen
    specified normal tissues or cells); id.  Claim 4 (claiming
28  antibodies that exhibit strong staining with no more than one of
    eighteen specified normal tissues or cells).

                                46

1  that "strong" means "strong."  Because "strong staining" is not
2  defined in the specification, and because its meaning is
3  ambiguous from the tables depicted in the '561 patent, it is
4  appropriate to resort to extrinsic evidence.  See Vitronics, 90
5  F.3d at 1583.

6          Experts for Chiron and Genentech agree that "strong
7  staining" is a term of art that is commonly used and understood
8  by pathologists. (Parslow Reply Decl. ¶ 11; Cote Decl. ¶ 6).
9  However, they disagree as to whether "strong staining" can
10 encompass moderate staining when the 0-1-2 scale described in the
11 '561 patent is employed.

12         This disagreement arises from the fact that scientists
13 have not used uniform scales for grading staining intensity. Some
14 use the 0-1-2 criteria described in the '561 patent, while others
15 use a four-point scale, with "0" indicating no staining, "1"
16 barely perceptible staining, "2" weak to moderate staining, and
17 "3" strong staining. (See F & R's at 44; Yu Decl. Ex. 6.)  At the
18 Markman Hearing, Genentech's expert, Dr. Cote, testified that a
19 grade of strong staining on a three point scale encompassed both
20 the strong staining grade and the moderate staining grade on the
21 four point scale.  Chiron's expert, Dr. Parslow, disagreed,
22 testifying that strong staining was the same no matter what scale
23 was used.

24         Magistrate Judge Hollows found Dr. Parslow's testimony
25 to be more persuasive, and after a review of the record, this
26 court agrees with that finding.  The "virtually universal" use of
27 the term "strong staining" among pathologists, (see Parslow Reply
28 Decl. ¶ 11), indicates that those skilled in the art share a

47

1  common understanding of the term that does not change depending
2  on what scale is used to grade the staining intensity. Dr.
3  Cote's testimony on cross examination supports this observation.
4  As Magistrate Judge Hollows notes:

5           [O]n cross examination Dr. Cote could not point to one
           exhibit where "strong staining" was ever defined in
6           other than the last category no matter what scale was
           used, or one exhibit where moderate staining was
7           included within a "strong" score.  His opinion was
           impeached significantly by Exhibit 125 – the staining
8           done by his own company.  In fact, the "moderate"
           staining found in Exhibit 125 was segregated from the
9           strong staining description.  The testimony indicated
           that for most immunoassay purposes, the categories
10          between negative staining and strong staining ran a
           rather large area because the most significant
11          categories for staining purposes, negative and strong,
           were much more precise, objective, and consistent in
12          their definitions.
           (F & R's at 45.)
13

14 Thus, the court adopts the following construction of the term
15 "strong staining":

16          **The term "strong staining" refers to a clear and**
           **definite readily detectable signal resulting directly**
17          **or indirectly from an interaction between an antibody**
           **and antigen, for example a color change as determined**
18          **by light microscopy or a change in fluorescence**
           **determined by FACS.  "Strong staining" does not**
19          **encompass staining that is less than strong, such as**
           **weak or moderate staining.**[25]
20
           Genentech objects that the references to the light
21
   microscopy and FACS immunoassay procedures are superfluous.
22

23         [25]   This construction is identical to the one recommended
   by Magistrate Judge Hollows, except that it adds the sentence
24 "'Strong staining' does not encompass staining that is less than
   strong, such as weak or moderate staining."  These changes simply
25 make explicit that which was implicit in the definition
   recommended by Magistrate Judge Hollows.  Chiron argues that the
26 adjective "intense" should be added so that the first sentence
   refers to "a clear and definite, <u>intense</u> readily detectable
27 signal."  However, adding the adjective "intense" unnecessarily
   clutters the sentence without conveying much useful additional
28 information.

                                48

1 Although these examples are not necessary to define the term,
2 they may assist the jury in understanding the meaning of "strong
3 staining."  Therefore, the court sees no reason to exclude them
4 from the definition of "strong staining."

5      E.   **Immunoassay**

6         The term "immunoassay" is used in claims 2, 4, 10, 12,
7 20, and 22 to describe the procedure used to determine strong
8 staining.  Magistrate Judge Hollows adopted Chiron's proposed
9 construction of the term:

10         **The term "immunoassay" refers to a laboratory technique**
        **that makes use of the binding between an antigen and an**
11         **antibody in order to identify or quantify the specific**
        **antigen, and more particularly, to a protocol which**
12         **uses the minimal concentration of the antibody which**
        **provides strong staining of the positive control.**
13

14         Genentech first argues that this construction is too
15 narrow, because an immunoassay measures interactions between
16 antibodies and a sample of cells or tissue, which include but are
17 not limited to antibody-antigen binding.  Although immunoassays
18 can be used to measure things other than antibody-antigen
19 binding, the '561 patent is exclusively concerned with antibody-
20 antigen binding.  This fact is apparent from the claims
21 themselves, which describe the immunoassay technique in
22 connection with strong staining, the purpose of which is to
23 measure antigen-antibody interactions.

24         Genentech next argues that the construction recommended
25 by Magistrate Judge Hollows improperly limits the term
26 "immunoassay" to a protocol using minimal concentrations of the
27 relevant antibody.  This protocol is set forth in the
28 specification.  See '561 Patent, at 18:31-40 (describing an

49

1  immunoperoxidase staining procedure in which "pure antibodies
2  were first titrated to find the minimal concentration giving
3  strong immunoperoxidase staining on breast cancer sections").
4  Although limitations from the specification may not be read into
5  the claims, the claims must be read in light of the
6  specification.  Bell Atlantic, 262 F.3d at 1269.  Given the
7  purposes of the patent and the uses toward which the immunoassays
8  of the patent claims are directed, it would be important to use a
9  minimal concentration of the antibody of interest.  Use of a high
10  concentration of the antibody may flood the tissue and give
11  strong staining everywhere, thus making it impossible to
12  determine the extent of actual binding.[26]  Therefore, the court
13  adopts the recommended construction in full.

14      F.  **"Extracellular Domain"**

15          A number of dependent claims in the patent are directed
16  toward monoclonal antibodies that "bind[] to the extracellular
17  domain of the human breast cancer antigen."  '561 Patent, Claims
18  7, 11, 15, 21, 25.  The parties agree that one skilled in the art
19

20          [26]   Genentech states that Chiron's expert, Dr. Parslow,
    "conceded that an immunoassay can be performed using either a
21  minimal concentration or a higher concentration." (Genentech
    Opp'n to F & R's, at 19.)  Because the specification and the
22  purposes of the patent support Magistrate Judge Hollows'
    interpretation, the court need not consider this extrinsic
23  evidence.  In any case, the fact that an immunoassay can be
    performed using a higher than minimal concentration of antibodies
24  does not make it useful for purposes of the patent.  Dr. Parslow
    never testified that effective staining results could be achieved
25  by using higher than minimal concentrations.  (See Transcript,
    Vol II, at 206:23 - 207:12)("Q: [I]n fact, when IMPATH did its
26  tests, it used the maximum concentration of the antibody that did
    not give unduly high background staining; right? A: I believe Dr.
27  Cote testified in the deposition that the two concentrations
    would be effectively the same in his view, that there wouldn't be
28  very much difference in the concentration that you arrived at by
    those two methods.")(emphasis added).

1  would interpret "extracellular" to mean "outside the cell."  The
2  meaning of "domain" is the focus of the parties' dispute.

3        "Domain" is ordinarily understood to refer to "region"
4  or "area."  Thus, Chiron posits that "extracellular domain" means
5  "the portion of the human breast cancer antigen that is external
6  to the cell."  Genentech would have the court ignore the plain
7  meaning of the term because the specification states: "The term
8  'domain,' or 'polypeptide domain' refers to that sequence of a
9  polypeptide that folds into a single globular region in its
10 native conformation, and that may exhibit discrete binding or
11 functional properties."  Id. at 12:38-42.  Read in context,
12 however, it is clear that the quoted text refers to antibodies,
13 not antigens.  The specification states that the invention
14 relates to "novel polypeptides having structure and function
15 substantially homologous to native antibody-antigen binding
16 sites."  Id. at 1:31-33.  The specification further describes
17 polypeptides as embodiments of the invention (i.e. monoclonal
18 antibodies).  See id. 4:1 ("in various related embodiments,
19 monomeric polypeptides are provided . . . ").  Thus, by
20 polypeptides, the specification is clearly referring only to
21 antibodies.  Therefore, the definition of "domain" in the
22 specification has no bearing on what is meant by the
23 "extracellular domain" of the human breast cancer antigen.
24 Accordingly, the court adopts the following construction:

25        **The term "extracellular domain" means the portion of**
          **the human breast cancer antigen that is external to the**
26        **cell.**

27 ///

28 ///

51

G.   **"Human c-erB-2 antigen"**

Magistrate Judge Hollows recommends the following
construction for the claim term "Human c-erbB-2 antigen":

> **"Human c-erbB-2 antigen" means the approximately 200kD
> protein associated with human breast cancer.**

Although Genentech originally proposed a different construction,
it does not object to Magistrate Judge Hollows' interpretation of
this term.  Having reviewed the record, the court finds that the
recommended construction is accurate and therefore adopts it.

IT IS THEREFORE ORDERED that the disputed claims be
construed as set forth above in boldface.

DATED: April 22, 2002

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

52

United States District Court
for the
Eastern District of California
April 23, 2002


* * CERTIFICATE OF SERVICE * *


2:00-cv-01252


Chiron Corp

    v.

Genentech

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on April 23, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


Eric S Walters                          SH/WBS
Morrison and Foerster LLP
425 Market Street
San Francisco, CA  94105-2482

Rachel Krevans
Morrison and Foerster LLP
425 Market Street
San Francisco, CA  94105-2482

James M Emery
Keker and Van Nest
710 Sansome Street
San Francisco, CA  94111-1704

Michael David Celio
Keker and Van Nest
710 Sansome Street
San Francisco, CA  94111-1704

Jack Vivian Lovell
Hunter Richey DiBenedetto and Eisenbeis
Renaissance Tower
801 K Street
23rd Floor
Sacramento, CA  95814-3525

Jack L. Wagner, Clerk

_Lorena Sanchez_
by: Deputy Clerk