**FILED**

**JUN 2 5 2002**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
            DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

CHIRON CORPORATION,

      Plaintiff,

  v.

GENENTECH, INC.,

      Defendant.

NO. CIV. S-00-1252   WBS GGH

MEMORANDUM AND ORDER RE:
INFRINGEMENT

----ooOoo----

      This lawsuit concerns Chiron's United States Patent No. 6,054,561 ("'561 patent"), a patent for monoclonal antibodies that bind to a human breast cancer antigen known as HER2. Chiron moves for summary judgment on the question of whether Genentech's product, Herceptin, infringes the '561 patent. Genentech opposes Chiron's motion on the sole ground that Herceptin is not a "monoclonal antibody" as the court has defined the term.

I.  Factual and Procedural Background

    A.  The '561 Patent

      In general, the '561 patent claims monoclonal antibodies capable of binding to a human breast cancer antigen known as HER2. The science of monoclonal antibodies is discussed

at length in this court's <u>Markman</u> order of April 22, 2002. Briefly, antibodies target and attach to foreign substances in the body known as antigens. Monoclonal antibodies are homogeneous preparations of essentially identical antibodies, all of which recognize and bind to the same antigen.

   In the early 1980s, scientists at Cetus, Chiron's predecessor, began a project to produce monoclonal antibodies capable of recognizing and binding to human breast cancer antigens but not to normal tissue. After testing thousands of monoclonal antibodies, Cetus scientists isolated several that bound to an antigen that occurred with great frequency in breast cancers, but with little frequency in normal tissue. That antigen, known today as "HER2" (Human Epidermal growth factor Receptor 2), is referred to in the '561 patent as "c-erbB-2."

   In 1984, Cetus filed the first in a long line of patent applications that ultimately resulted in the issuance in April of 2000 of the '561 patent. The '561 patent consists of thirty-one separate claims, the first twenty-five of which are at issue in this lawsuit.

   The claims of the '561 patent fall within four broad categories. In the first category are three independent claims, claims 1, 9, and 19, which recite monoclonal antibodies that bind to a particular breast cancer antigen. Specifically, claim 1 is directed toward "[a] monoclonal antibody that binds to a human breast cancer antigen that is also bound by monoclonal antibody 454 C11. . . ."; claim 9 claims "[a] monoclonal antibody that binds to a human breast cancer antigen that is also bound by monoclonal antibody 520 C9. . . ."; and claim 19 claims "[a]

monoclonal antibody that binds to human c-erbB-2 antigen." The patent equates the antigen bound by 454 C11 with the antigen bound by 520 C9 and c-erbB-2. ('561 patent, at 27:1-17; Claim 8, 16, 18). For ease of reference, the court will refer to these claims as the "independent claims."

The second category of claims are dependent claims which incorporate every limitation of the independent claims, but also require that the monoclonal antibodies of the independent claims exhibit certain staining activity in an immunoassay. ('561 Patent, claims 2, 4, 7, 10-12, 20, 22, 25). Claims 2 and 4 are representative. Claim 2 is directed toward the monoclonal antibody of claim 1, where the monoclonal antibody exhibits strong staining on three or less identified normal tissues in an immunoassay.[1] Claim 4 requires strong staining on one or less of the enumerated normal tissues. The court will refer to these claims as the "staining claims."

The third category of claims are dependent claims directed toward the monoclonal antibodies that bind to the extracellular domain of the referenced human breast cancer antigen. Claims 3, 7, 11, 15, 21, 25 are referred to herein as the "extracellular domain claims."

The fourth and final category of claims in the patent, consisting of claims 5, 6, 13, 14, 23, and 24, are dependent claims that require binding to a human breast cancer cell line.

---

[1]  Claim 2 reads: "The monoclonal antibody of claim 1, wherein the monoclonal antibody exhibits strong staining intensity as determined in an immunoassay with three or less of the normal tissues and blood cells selected from the group consisting of pancreas, esophagus, lung, kidney, colon, stomach, brain, tonsil, liver, heart, ovary, skin, breast, platelets, red cells, lymphocytes, monocytes and granulocytes."

3

These claims are referred to herein as the "cell line claims." The court held a Markman hearing, and issued an order on April 22, 2002 construing a number of the terms in the above claims.

B. Herceptin

The accused product, Herceptin, is a drug used in the treatment of breast cancer. Herceptin is the product of years of research and development by Genentech scientists that began in the mid 1980s. (Slikowsky Decl. Ex. A at 2.) Like scientists at Cetus, scientists at Genentech were interested in identifying antibodies capable of binding to human breast cancer for the purpose of developing a breast cancer drug. In the late 1980s, they discovered a murine (mouse) monoclonal antibody named "4D5." (Id. at 3.) In addition to binding strongly to HER2, 4D5 stops or reduces the growth of breast tumors that overexpress HER2. (Id.) This "antiproliferative effect" results from the binding of 4D5 to the HER2 antigen. (Id.)

After it identified 4D5, Genentech sought to "humanize" the murine antibody. Genentech scientists identified portions of 4D5's amino acid sequence and used those as a "blueprint" for creating a synthetic amino acid chain that had the binding properties of 4D5. This chain was combined with chains of amino acids modeled after human antibodies to create a "humanized" antibody. (Id. at 4.)

Humanization was an important step in producing antibodies that could be used as effective therapeutics against breast cancer. Repeated doses of antibodies derived from animal sources provoked an adverse immune response in some human patients, as their bodies rejected the presence of non-human

elements. Humanized antibodies, however, reduced the potential for this response by surrounding animal-derived binding sites with human DNA. (Id.) Genentech succeeded in humanizing 4D5 in 1992. (Crotty Decl. Ex. 7, 1992 Carter article). The humanized antibody was called "HuMAb4d5-8," short for "Humanized Monoclonal Antibody 4D5-variant 8."

A variant of HuMAb4d5-8 known as "trastuzumab" is the active ingredient in Herceptin. (Sliwkowski Dep. at 39; Crotty Decl. Ex. 3, Herceptin® Product Insert.) Trastuzumab is produced by "transfecting," or introducing, heavy and light chains of the HuMAb4d5-8 antibody into a Chinese Hamster Ovary cell. ("CHO cell"). (Sliwkowsky Decl. Ex. A at 5.) CHO cells do not produce antibodies naturally; however, once transfected with HuMAb4d5-8, they produce additional HuMAb4d5 antibodies, as well as molecular variants of HuMAb4d5-8. (Harris Decl. ¶ 5.)

The HuMab4d5-8 variants include molecules with different "glycosylation" structures, which essentially are sugars attached to the amino acid chain of the antibody. (Id. ¶ 14.) They also include molecules with slightly different amino acid structures, which can result from partial "deamidation" (change in amino-acids) or partial "isomerization" (conversion into a different structural arrangement) at particular positions in the amino acid chain. (Id. ¶¶ 9-13.) These amino acid variants constitute approximately 26% of the overall antibody composition of Herceptin. (Id. ¶ 9.) Each of these variants have between 99.8% and 99.9% homology, or similarity in amino acid sequence, with HuMab4d5-8. (Id. Ex. A at 243.) According to a paper published by Genentech scientists, the variants in the

antibody population of Herceptin do not have a significant effect on Herceptin's potency. (Id. Ex. A at 243.)

In 1998, after several years of clinical trials, the FDA approved Herceptin to treat certain forms of breast cancer. (Id. Ex. 8, FDA Approval Letter). Genentech has made, sold, and offered to sell Herceptin in the United States since that time. (Crotty Decl. Ex. 10.)

## II. Discussion

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

According to section 271(a) of the Patent Act, "whoever without authority makes, uses, offers to sell or sells any patented invention within the United States . . . infringes the patent." 35 U.S.C. § 271(a). Determining whether a patent is

1  infringed requires a two step analysis. First, the court must
2  construe the disputed terms of the patent. See Markman v.
3  Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)(en
4  banc), aff'd, 517 U.S. 370 (1996). Second, the court must
5  compare the properly construed claims to the accused product.
6  Id. at 976. A product literally infringes the patent if each and
7  every limitation of the properly interpreted claim is found in
8  the accused product. See Transmatic, Inc. v. Gulton Indus.,
9  Inc., 53 F.3d 1270, 1277 (Fed. Cir. 1995).

10         The court has already construed the terms of the
11 patent, and Genentech admits to making, offering to sell, and
12 selling Herceptin in the United States. Thus, the only issue for
13 the court to decide is whether Herceptin contains all of the
14 limitations of the claims as construed by the court. Whether
15 Herceptin infringes the '561 patent is a question of fact.
16 Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1324 (Fed. Cir.
17 2002).

18         One limitation that appears in all of the claims in the
19 '561 patent is that the antibody must be a "monoclonal antibody."
20 The court has construed the term "monoclonal antibody" to mean:

> An antibody composition having <u>a homogeneous (essentially identical) antibody population</u>. The term is not limited regarding the species or source of the antibody, nor is it limited by the manner in which it is made. For example, the term includes monoclonal antibodies produced by a methodology other than hybridoma which results in monoclonal antibodies no matter how subcategorized, e.g., hybrid, altered, chimeric, or humanized. <u>The term includes variants that naturally arise during the production of monoclonal antibodies.</u> The term includes whole immunoglobulins.

28 (April 22, 2002 Order, at 38)(emphasis added). Genentech argues

7

that Herceptin does not infringe any of the claims in the '561 patent because Herceptin does not have a homogenous antibody population.[2]

It is undisputed that approximately 26% of Herceptin's antibody composition has a different amino acid structure from HuMAb4d5-8, and that some of the antibodies within the population are also glycosylated. However, the definition of monoclonal antibody allows for "variants that naturally arise during the production of monoclonal antibodies," as long as the antibodies in the resulting preparation are "essentially identical." If the variants in Herceptin's antibody population arise naturally during Herceptin's production and are essentially identical, then Herceptin infringes the patent.

Genentech argues that because CHO cells do not naturally produce antibodies, any variants that arise from a population of antibodies produced by a transfected, or as Genentech puts it, "genetically manipulated," CHO cell are not "natural." This argument is inconsistent with both the patent and the understanding of those skilled in the art.

The patent explains that some variants will arise during the production of monoclonal antibodies, and includes these within the definition of "monoclonal antibody":

Antibodies are normally synthesized by lymphoid cells

---

[2] Chiron contends that Genentech should be precluded from raising the argument that Herceptin is non-homogenous and therefore does not infringe the '561 patent, because Genentech failed to identify this theory in its responses to Chiron's interrogatories. See Fed. R. Civ. Proc. 26(e), 37(c)(1). Chiron, however, has not shown or even alleged any prejudice resulting from Genentech's purported failure to supplement its interrogatory responses. The court refuses to preclude a substantive defense on a mere technicality.

> derived from B lymphocytes of bone marrow. Lymphocytes derived from the same clone produce immunoglobulin of a single amino acid sequence. Lymphocytes cannot be directly cultured over long periods of time to produce substantial amounts of their specific antibody. However, Kohler et al (1975) <u>Nature</u> 256: 496-497, demonstrated that a process of somatic cell fusion, specifically between a lymphocyte and a myeloma cell, could yield hybrid cells which grow in culture and produce a specific antibody called a "monoclonal antibody" . . . . The resulting hybrid cell was called a "hybridoma." A monoclonal antibody belongs to a group of antibodies whose population is substantially homogeneous, i.e. the individual molecules of the antibody population are identical except for <u>naturally occurring mutations.</u>

('561 Patent at 1:39-54) (emphasis added). Genentech interprets this language to mean that "the 'mutations' or variants contemplated [by the patent] are those that arise from cells such as lymphocytes of bone marrow that naturally produce antibodies." (Genentech Opp'n at 3.) However, nothing in the language cited by Genentech suggests that it is the lymphocyte cells that must produce these mutations. In fact, the expert testimony in the record suggests that the variations referred to occur because the monoclonal antibodies are produced in a host cell, i.e. something <u>other</u> than a lymphocyte, such as a hybridoma. (Mar. 6, 2002 <u>Markman</u> Tr. at 34 (testimony of Dr. Lanier that "if you produce antibodies in different host cells, they may suddenly change the sugar attached to the antibody," resulting in a "naturally occuring mutation."))

At the <u>Markman</u> hearing, Chiron's expert Dr. Lanier was asked about what he understood the patent to mean by "naturally occurring mutations." He testified that the term meant small, minor variations in antibody composition, and that glycosylation, deamidation and isomerization would all be examples of naturally

occurring mutations. (Id. at 34-35.) He also testified that each of these types of naturally occurring mutations were known to occur in 1984, when the first patent application leading to the '561 patent was filed. (Id. at 35; see also Lanier Reply Decl. ¶¶ 8-10.) Glycosylated variants, and variants resulting from deamidation and isomerization are the variants of HuMAb4d5-8 in Herceptin. Given the plain language of the patent, the court's claim construction, and Dr. Lanier's expert testimony, Genentech's argument that the variants in Herceptin do not arise naturally from its production rings hollow.

        Moreover, the logic of Genentech's argument dictates that no one could ever make a homogeneous preparation of antibodies having "natural" variants from a hybridoma, which is inconsistent with the way this court has defined a monoclonal antibody. Hybridomas do not exist in nature – they are produced in the laboratory by fusing a myeloma with a lymphocyte. Like a CHO cell, a myeloma will not produce antibodies unless it is "manipulated." Variants that are produced from a hybridoma are therefore no more "natural" by Genentech's definition than variants produced by CHO cells. Similarly, because humanized monoclonal antibodies do not occur in nature, any variants that would arise from trying to make a humanized monoclonal antibody would not be "natural" according to Genentech's interpretation. This court, however, has already found that the term "monoclonal antibody" encompasses both humanized antibodies and hybridoma-derived antibodies.

        Genentech has also failed to present any evidence that the variants in Herceptin are not "essentially identical" to

10

HuMab4d5-8 and to each other so as to make Herceptin a non-homogeneous preparation.[3]  To the contrary, it is undisputed that the variants are at least 99.8% homologous to trastuzumab, and have no significant impact on the purity or potency of Herceptin.

Finally, the testimony of experts for both Chiron and Genentech overwhelmingly confirms that Herceptin is a homogeneous preparation of antibodies.  Genentech's expert, Dr. Deborah French, testified at her deposition that "Herceptin is a humanized antibody which as a product is a homogeneous population."  (French Dep. at 59.)  Dr. John Adair, another Genentech expert, similarly testified that trastuzumab is sold as a homogeneous preparation antibody in the drug Herceptin.  (Adair Dep. at 195.)  Dr. Jay Unkeless, also testifying on Genentech's behalf, confirmed that if Genentech made Herceptin in a recombinant cell line, it would be an antibody composition having a homogeneous population.  (Unkeless Dep. at 120; see also Slikowsky Dep. at 45 (responding affirmatively when asked if Herceptin contains a "substantially pure population of antibodies"); Lanier Reply Decl. ¶ 12 (concluding that Herceptin is a homogeneous preparation of antibodies).)  Significantly, neither of the experts upon whose testimony Genentech relies for purposes of opposing Chiron's motion, Drs. Sliwkowksy and Harris,

---

[3]  At oral argument, Genentech suggested that because not all of the antibodies in Herceptin are identical, there could be no literal infringement of the '561 patent.  Genentech argued that the proper question for the court was therefore whether Herceptin infringes under the doctrine of equivalents.  However, the claims themselves, as the court has construed them, do not require a completely identical population of antibodies.  A product will literally infringe the patent if it is a preparation of "essentially identical" antibodies. (See April 22, 2002 Order, at 38)(emphasis added).

11

have attested that Herception is <u>not</u> a homogeneous preparation of antibodies.

In light of the language of the patent, this court's claim construction, and the undisputed expert testimony in the record, no reasonable jury could conclude that Herceptin is a non-homogeneous antibody population. The undisputed facts clearly establish that Herceptin is a "monoclonal antibody" as this court has construed the term. It is further undisputed that Herceptin binds to the same antigen as 454 C11, 520 C9, and to c-erbB-2.[4] Therefore, Herceptin literally infringes all of the independent claims of the patent. Because Genentech does not dispute that Herceptin also meets all of the limitations in the dependent claims of the patent, Chiron is entitled to summary judgment that Herceptin infringes all of the claims of the '561 patent at issue in this case.

IT IS THEREFORE ORDERED that Chiron's Motion For Summary Judgment Re: Infringement be, and the same hereby is, GRANTED. The court determines as a matter of law that Genentech's product, Herceptin, infringes claims 1 through 25 of United States Patent No. 6,054,561.

DATED: June 24, 2002

*/s/ William B. Shubb*
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[4] Genentech "does not advance a non-infringement position on th[e] basis" that Herceptin does not "bind" to HER2, and has come forward with no evidence to refute Chiron's evidence on this point. (Genentech Opp'n To Mot. S.J. Re: Infringement at 1 n.3.)

United States District Court
for the
Eastern District of California
June 25, 2002

* * CERTIFICATE OF SERVICE * *

2:00-cv-01252

Chiron Corp

   v.

Genentech

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on June 25, 2002, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Eric S Walters
Morrison and Foerster
755 Page Mill Road
Palo Alto, CA  94304-1018

James M Emery
Keker and Van Nest
710 Sansome Street
San Francisco, CA  94111-1704

Michael David Celio
Keker and Van Nest
710 Sansome Street
San Francisco, CA  94111-1704

Jack Vivian Lovell
Hunter Richey DiBenedetto and Eisenbeis
Renaissance Tower
801 K Street
23rd Floor
Sacramento, CA  95814-3525

Rachel Krevans
Morrison and Foerster LLP
425 Market Street
San Francisco, CA  94105-2482

SH/WBS

Jack L. Wagner, Clerk

by: Deputy Clerk